858 F.2d 1409
 28 ERC 1373, 57 USLW 2238, 19 Envtl.
L. Rep. 20,198
 NATIONAL AUDUBON SOCIETY, et al., Plaintiff/Cross-Defendant/Appellee,
v.
DEPARTMENT OF WATER, et al., Defendants,
and
State of California, Defendant/Cross-Complainant/Appellant.
NATIONAL AUDUBON SOCIETY; Friends of the Earth; Mono Lake
Committee; Los Angeles Audubon Society; David Gaines;
Charles K. Simis; Walter T. Hansen; and John E.
Boynton,Plaintiffs/Cross-Defendants/Appellants,
v.
DEPARTMENT OF WATER, et al., Defendants,
and
State of California, Defendant/Cross-Complainant/Appellee.
NATIONAL AUDUBON SOCIETY, et al., a corporation,
Plaintiffs/Cross- Defendants/Appellees,
v.
DEPARTMENT OF WATER & POWER OF THE CITY OF LOS ANGELES,
Defendant/Cross- Complainant,
v.
UNITED STATES of America, et al., Cross-Defendants,
and
State of California, Cross-Defendants/Cross-Complainant/Appellant.
NATIONAL AUDUBON SOCIETY, et al., a corporation,
Plaintiffs/Cross- Defendants/Appellees,
v.
DEPARTMENT OF WATER & POWER OF THE CITY OF LOS ANGELES,
Defendant/Cross- Complainant/Appellant,
v.
UNITED STATES of America, et al., Cross-Defendants,
and
State of California, Cross-Defendants/Cross-Complainant.
NATIONAL AUDUBON SOCIETY, et al., a corporation,
Plaintiffs/Cross- Defendants/Appellants,
v.
DEPARTMENT OF WATER & POWER OF THE CITY OF LOS ANGELES,
Defendant/Cross- Complainant/Appellees,
v.
UNITED STATES of America, et al., Cross-Defendants,
and
State of California, Cross-Defendant/Cross-Complainant.
 Nos. 85-2046, 85-2105 and 85-2236 to 85-2238.
 United States Court of Appeals,
Ninth Circuit.
 Argued April 18, 1986.
Submitted Sept. 15, 1986.
Decided Oct. 6, 1988.
As Amended Dec. 22, 1988.
 
 F. Bruce Dodge, Patrick Flinn, San Francisco, Cal., and Lynne M. Yerkes, Walnut Creek, Cal., for plaintiffs/cross-defendants and appellants/cross-appellees.
 Janet K. Goldsmith, Sacramento, Cal., for defendant/cross-complainant and appellee/cross-appellant.
 Roderick E. Walston, San Francisco, Cal., for cross-defendants and appellees/cross-appellants.
 Appeal from the United States District Court for the Eastern District of California.
 Before GOODWIN,* REINHARDT and BRUNETTI, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 
 1
 * FACTS AND PROCEEDINGS BELOW
 
 
 2
 These consolidated interlocutory appeals and appeals as-of-right arise from a suit filed in 1979 by the National Audubon Society and others ("Audubon") against the Los Angeles Department of Water and Power ("DWP") to restrain DWP's diversion to Los Angeles of four freshwater streams that would otherwise flow into Mono Lake.
 
 
 3
 Mono Lake is a natural saline lake located wholly within the State of California. Pursuant to permits granted by the California Water Resources Control Board, DWP has carried out these diversions since 1940. With the diversion of the Lake's surface water sources, its natural volume has been decreased and some 14,000 acres of lake bed have been exposed. The reduction of the Lake volume has also caused increases in salinity and ion concentration.
 
 
 4
 Audubon's original complaint, filed in the Superior Court for Mono County, asserted: 1) violation of the public trust; 2) violation of California Constitution article XVI, section 6 (prohibiting a gift by the state of a state asset); 3) a quiet title action to establish public trust rights in the waters of the Mono Basin; 4) public and private nuisance (from mud and dust created by reliction); and 5) violation of California Constitution article X, section 4 (prohibiting obstruction of navigable waters). Audubon sought declaratory and injunctive relief.
 
 
 5
 The case was transferred to Alpine County Superior Court, and DWP filed a cross-complaint containing four counts. The first count sought adjudication of Basin water rights as to all appropriators; the second sought to quiet title to those rights. These two causes named 117 cross-defendants, including all of the plaintiffs, the State of California, the United States Forest Service, the Bureau of Land Management, and numerous private water users. The third cause of action sought a declaration that, to the extent that the United States has jurisdiction over California's exercise of its navigation trust, Congress has consented to the impairment of the navigable waters of Mono Lake. Finally, DWP asserted that any nuisance at Mono Lake is attributable to the owner of the newly exposed Lake bed, and sought a declaration that conditions at the Lake resulted from a valid exercise of the police power by the State of California.
 
 
 6
 Thereafter, the United States removed the action to federal district court pursuant to 28 U.S.C. Sec. 1442(a)(1) on the grounds that the cross-complaint implicated acts of the named federal agencies. The district court determined that, although only the third cause of action in DWP's complaint implicated the acts of federal agencies, the entire action was removable. Accordingly, the court denied DWP's motion to remand. National Audubon Soc. v. Department of Water and Power, 496 F.Supp. 499 (E.D.Cal.1980).
 
 
 7
 DWP then made a motion to amend its cross-complaint to drop its third cause of action and filed a concurrent motion to remand to state court on the ground that the original basis for removal had been extinguished. DWP alternatively asked the court to abstain.
 
 
 8
 At the same time, Audubon sought permission to amend its complaint to include a cause of action based on the federal common law of nuisance. Audubon's federal nuisance claim was predicated on its assertion that Mono Lake is an "interstate or navigable" water in which there is an overriding federal interest, and that DWP's diversions were causing, inter alia, water pollution by increasing the Lake's salinity and ion concentration, and air pollution in the form of alkali dust storms from the newly exposed lake bed. In the same order, the district court granted DWP's motion to amend its cross-complaint, but also granted Audubon's motion to add a new federal claim to its complaint. Accordingly, the court denied DWP's motion to remand.
 
 
 9
 Shortly thereafter, the district court determined that abstention would be appropriate and instructed Audubon to file an action in state court to resolve two issues: 1) the relationship between the public trust doctrine and the California water rights system, and 2) whether exhaustion of administrative remedies was a prerequisite to Audubon's suit. The court ruled that it would retain jurisdiction over the case during the pendency of the state action.
 
 
 10
 Audubon's state action for declaratory judgment on the two issues in the lower court's abstention order eventually reached the California Supreme Court. Ruling in favor of Audubon, the court held that the public trust doctrine was not subsumed in the state water rights system and that Audubon was not required to exhaust administrative remedies before the State Water Resources Control Board. National Audubon Society v. Superior Court, 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, cert. denied sub nom. Los Angeles Dept. of Water & Power v. National Audubon Society, 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983).
 
 
 11
 The parties returned to federal district court, whereupon DWP, joined by California, filed two motions: the first, a motion for partial summary judgment directed to Audubon's federal nuisance claims, and the second, a renewed motion for remand to state court on the basis that, if the motion for partial summary judgment were granted, no federal issues would remain to be decided.
 
 
 12
 In an order dated November 8, 1984, the district court granted in part and denied in part DWP's summary judgment motion. The court held that Audubon could state a federal common law nuisance claim for air pollution caused by dust from the lake bed, and that the air pollution claim was not preempted by the Clean Air Act. The court also held that the water pollution claim was preempted by the Federal Water Pollution Control Act (FWPCA). In addition, the court granted the motion to remand the state law claims to state court, retaining jurisdiction over only the single remaining federal nuisance claim for interstate dust pollution.
 
 
 13
 By order of April 15, 1984, the district court certified the following three questions for interlocutory appeal: 1) Whether the federal common law nuisance doctrine applies as a basis for restraining the water diversions in this case; 2) Assuming that the federal common law nuisance doctrine applies as a basis for restraining such water diversions, whether the doctrine can be asserted by plaintiffs in this instance; and 3) Whether the district court, having obtained jurisdiction of this matter pursuant to the removal statute of 28 U.S.C. Sec. 1442(a)(1), has discretion to remand this action to the state court after the original basis for removal was deleted in an amendment intended to defeat federal court jurisdiction.
 
 
 14
 On May 7, 1985, the district court issued a declaratory judgment pursuant to Fed.R.Civ.P. 54(b) on California's cross-complaint. The court ruled that federal common law of nuisance applies to water diversions authorized under state water rights laws to the extent such diversions cause potential impacts on air quality, but not to the extent that such diversions cause potential impacts on water quality. California and Audubon have appealed this judgment. Audubon, California and DWP have appealed the questions previously certified for interlocutory appeal.
 
 II
 ANALYSIS
 A. Federal Common Law Nuisance Action
 1. Standard of Review
 
 15
 The district court granted summary judgment on the federal common law nuisance claims. We review that decision de novo, Poland v. Martin, 761 F.2d 546, 547 (9th Cir.1985), to determine whether there are any genuine issues of material fact, Fed.R.Civ.P. 56(c), and whether the district court correctly applied the relevant substantive law. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986).
 
 
 16
 2. Federal Common Law Nuisance Claim--Water Pollution
 
 
 17
 The district court concluded that Audubon's federal common law nuisance claim for water pollution is preempted by the FWPCA. In so ruling, the district court relied on the Supreme Court's statement in Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), that "the federal common law of nuisance in the area of water pollution is entirely pre-empted by the more comprehensive scope of the FWPCA, which was completely revised after the decision in Illinois v. Milwaukee." Id. at 22, 101 S.Ct. at 2627. See Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (Milwaukee II ). The Court's statement that federal common law nuisance claims for water pollution are preempted by the FWPCA is unequivocal and we affirm the district court's ruling that this claim is preempted by the FWPCA. See also International Paper Co. v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 810, 93 L.Ed.2d 883 (1987) ("[T]he Court held that federal legislation now occupied the field, preempting all federal common law.")3. Federal Common Law Nuisance Claim--Air Pollution
 
 
 18
 The district court concluded that the federal common law nuisance action based on air pollution could be properly asserted, that it is not preempted by the Clean Air Act, and that Audubon has standing to assert this claim. We hold that Audulon cannot properly assert a federal common law nuisance action based on air pollution.
 
 
 19
 There is no general federal common law. "Federal courts, unlike state courts, are not general common law courts and do not possess a general power to develop and apply their own rules of decision. Milwaukee II, 451 U.S. at 312, 101 S.Ct. at 1790 (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)). "The enactment of a federal rule in an area of national concern and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." Milwaukee II, 451 U.S. at 313, 101 S.Ct. at 1790 (citing Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)). " '[W]e start with the assumption' that it is for Congress, not federal courts, to articulate appropriate standards to be applied as a matter of federal law." Milwaukee II, 451 U.S. at 317, 101 S.Ct. at 1792.
 
 
 20
 Nonetheless, the Supreme Court has recognized the need and authority of courts to fashion federal common law in a "few and restricted" instances. Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981), quoting Wheeldin v. Wheeler, 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963). "These instances ... fall into essentially two categories: those in which a federal rule of decision is 'necessary to protect uniquely federal interests,' Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964), and those in which Congress has given the courts the power to develop substantive law, Wheeldin v. Wheeler, 373 U.S. at 652 [83 S.Ct. at 1445]." Texas Industries, 451 U.S. at 640, 101 S.Ct. at 2067.
 
 
 21
 We first determine whether Congress has given the courts the power to develop federal substantive law. In the Clean Air Act, 42 U.S.C. Sec. 7401 et seq., Congress established a comprehensive state and federal scheme to control air pollution in the United States. The central elements of this comprehensive scheme are the Act's provisions for uniform national standards of performance for new stationary sources of air pollution. 42 U.S.C. Sec. 7411. A stationary source of air pollution is expressly limited to any building, structure, facility or installation which emits any air pollution. Id. Sec. 7411(3). The Act's provisions also provide for uniform national emission standards for hazardous air pollutants likely to cause an increase in mortality or serious illness, id. Sec. 7412, for promulgation of primary and secondary national ambient air quality standards (NAAQS), id Secs. 7408-09, and for the development of national ambient air quality standards for motor vehicle emissions. Id. Sec. 7521.
 
 
 22
 Two sections of the Clean Air Act govern the establishment and revision of the national ambient air quality standards. Section 108 directs the Administrator of the Environmental Protection Agency (EPA) to identify pollutants which may reasonably be anticipated to endanger public health or welfare and to issue air quality criteria for them. 42 U.S.C. Sec. 7408. Section 109 directs the Administrator to propose and promulgate "primary" and "secondary" NAAQS for pollutants identified under Section 108. 42 U.S.C. Sec. 7409. The Act defines a primary standard as one the attainment and maintenance of which, in the judgment of the Administrator, based on specific criteria and allowing for an adequate margin of safety, is requisite to protect the public health. 42 U.S.C. Sec. 7409. A secondary standard must specify a level of air quality, the attainment of which, in the judgment of the Administrator, based on specific criteria and allowing for an adequate margin of safety, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of the pollutant in the ambient air. Id.
 
 
 23
 Once the EPA determines that a particular pollutant has an adverse effect on public health or welfare and originates from one or more numerous or diverse mobile or stationary sources, the EPA must develop national air quality standards and the states must implement them within a limited time period. Natural Resources Defense Council, Inc. v. Train, 545 F.2d 320, 322-24. (2nd Cir. 1976).
 
 
 24
 Since 1977, EPA has allowed states with rural fugitive dust areas (RFDA'S) to discount fugitive dust in developing and enforcing a state implementation plan (SIP) for attainment and maintenance of the NAAQS for particulate matter. See 40 C.F.R. Sec. 51.110(f) (1987). On July 1, 1987, the EPA promulgated national ambient air quality standards for particulate matter with an aerometric diameter of a nominal 10 microns or less (PM10 in varying amounts. 52 Fed. Reg. 24716 (July 1, 1987) (Proposed Policy Statement). The EPA has concluded (1) that long time exposure to high concentrations of PM10 constitutes a health risk, and (2) that specific components of PM10 cannot be safely excluded from the primary standard. Id. at 24717. The EPA also promulgated polices and regulations by which it will implement the PM10 NAAQS. 40 C.F.R. Secs. 50.6, 50.7 (1987); see 40 C.F.R. Part 50, Appendix J and Appendix K (1987). In accordance with these standards, the EPA categorized areas of the nation into three groups based on the likelihood that the existing state implementation plan must be revised to protect the PM10 NAAQS. Areas with a strong likelihood of violating the PM10 NAAQS and requiring substantial SIP revisions include the Owens Valley area in California. The EPA has placed the Mono Lake area in group III: an area with a strong likelihood of attaining the PM10 NAAQS and therefore probably was an adequate control strategy. See 52 Fed. Reg. 29383.
 
 
 25
 Nothing in the Clean Air Act suggests Congress intended to rely for enforcement of this Act upon a federal common law remedy. To the contrary, the statute provides the EPA and the states with power to remedy unlawful air pollution. See 42 U.S.C. Secs. 7413, 7420 (federal enforcement procedures) and 7416 (retention of state authority). The Clean Air Act also authorizes citizens to enforce the Act. However, no such enforcement action is brought here.
 
 
 26
 The Clean Air Act does not "restrict any right which any person may have under any statute or common law to seek enforcement of any emission standard or limitation." 42 U.S.C. Sec. 7604. In a federal nuisance action, the court is asked to determine whether an act or omission causes damage to the public. However, the Act empowers the EPA, not the federal courts, to identify pollutants and concentration levels that endanger or are likely to endanger the health and welfare of the public and requires states to develop a plan for implementing, maintaining and enforcing the NAAQS. 42 U.S.C. Sec. 7410.
 
 
 27
 Since Congress has not authorized the courts to develop a substantive law of air pollution, if federal common law can be fashioned at all, it will be because a federal rule of decision is "necessary to protect uniquely federal interests." Texas Industries, 451 U.S. at 640, 101 S.Ct. at 2067. Not all federal interests fall into this restricted category. Rather, a "uniquely federal interest" exists "only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of states or our relations with foreign nations, and admiralty cases." Id. at 641, 101 S.Ct. at 2067. For purposes of our discussion, the only applicable areas for consideration are whether rights and obligations of the United States are involved or whether there is an interstate dispute implicating the conflicting rights of states. "In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate ... nature of the controversy makes it inappropriate for state law to control." Id.
 
 
 28
 (a) Rights and obligations of the United States.
 
 
 29
 Appellants argue that there is a significant federal interest in the quality of the air in the Mono Lake area. The district court's decision also might be read as implicating unique rights and obligations of the United States, when it states that the defendant's actions "invade federally protected interests ... (the integrity of the nation's air and water)...."
 
 
 30
 We acknowledge that in the context of an interstate water pollution case, the Supreme Court stated that federal courts do fashion federal laws where federal rights are involved and that there is a federal common law when dealing with air and water in their ambient or interstate aspects. Milwaukee I, 406 U.S. at 103, 92 S.Ct. at 1392. The Supreme Court made this statement in the following context. The remedy sought by Illinois for interstate water pollution was not within the precise scope of remedies prescribed by Congress in the Federal Water Pollution Control Act. Id. at 103, 92 S.Ct. at 1392. "The Act makes pollution of interstate and navigable waters subject 'to abatement' when it 'endangers the health and welfare of any persons.' " Id. at 102, 92 S.Ct. at 1392. The abatement authorized by the Act, however, is a "long-drawn-out procedure." Id. at 103, 92 S.Ct. at 1392. According to the Supreme Court, "remedies which Congress provides are not necessarily the only federal remedies available" and "[i]t is not uncommon for federal courts to fashion federal law where federal rights are concerned." Id. at 103, 92 S.Ct. at 1392 (quoting Textile Workers v. Lincoln Mills, 353 U.S. 448, 456-57, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957)). Accordingly, in Milwaukee I, the Supreme Court acknowledged a federal common law remedy to abate interstate or navigable water pollution but says nothing regarding federal common law as to the rural fugitive dust at issue here.
 
 
 31
 By promulgating the Clean Air Act, Congress has recognized "some" limited federal interest with regard to the nation's air quality. The Clean Air Act also provides that "[e]ach state shall have the primary responsibility for assuring air quality within the entire geographic area comprising such state," 42 U.S.C. Sec. 7407(a), and "[t]hat the prevention and control of air pollution at its source is the primary responsibility of states and local governments." Id. at Sec. 7401(a)(3). Thus, there is not "a uniquely federal interest" in protecting the quality of the nation's air. Rather, the primary responsibility for maintaining the air quality rests on the states.
 
 
 32
 Additionally, the cases cited in the Texas Industries decision as well as controlling precedent in federal common law nuisance cases indicate that this case does not involve the kind of "right or obligation" that must be protected by federal common law.
 
 
 33
 In Texas Industries, 451 U.S. at 641, n. 12, 101 S.Ct. at 2067, n. 12, the Court cited United States v. Little Lake Misere Land Co., 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), and Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), as examples of cases in which "rights and obligations of the United States" were involved.
 
 
 34
 The Little Lake Misere case involved a written agreement made by the United States to acquire land for public purposes explicitly authorized by Congress. The Supreme Court held that "in a setting in which the rights of the United States are at issue in a contract to which the United States is a party and 'the issue's outcome bears some relationship to a federal program, no rule may be applied which would not be wholly in accord with that program.' " Id., 412 U.S. at 604, 93 S.Ct. at 2403 (citation omitted). In Clearfield Trust Co., the United States was suing for reimbursement on a forged check drawn on the Treasurer of the United States. The Court held that "the rule of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, does not apply and the rights and duties of the United States on commercial paper which the United States issues are governed by federal rather than local law." 318 U.S. at 366, 63 S.Ct. at 574-75. The specific facts underlying the Little Lake Misere and Clearfield Trust cases clearly indicated that the federal rights (U.S. agreement to acquire land) and obligations (U.S. commercial paper) at issue required application of federal law. The controversies intimately involved "the authority and duties of the United States as sovereign," Texas Industries, 451 U.S. at 641, 101 S.Ct. at 2067, therefore making application of anything but federal law inappropriate.
 
 
 35
 The facts of our case stand in marked contrast. Although there might arguably be some unquantified federal interest in protecting the nation's air quality, this type of interest does not necessarily involve the authority and duties of the United States as sovereign to the extent that our federal system requires that the controversy be resolved under federal law, to the exclusion of state law.
 
 
 36
 Quite to the contrary, application of state law in this case is particularly appropriate. The appellant has failed to demonstrate that "our federal system does not permit the controversy to be resolved under state law," Texas Industries, 451 U.S. at 641, 101 S.Ct. at 2067, nor could it do so. There is no conflict between the alleged federal policies or interests that might be involved in this case and the use of California's common law of nuisance. Additionally, because the appellant is currently seeking the protection of California nuisance laws in California State court, the appellant has clearly demonstrated that California nuisance law is both well-suited and applicable to the case at bar. Therefore, it is inconsistent to argue "that both federal and state nuisance law apply to this case. If state law can be applied, there is no need for federal common law; if federal common law exists, it is because state law cannot be used." Milwaukee v. Illinois, 451 U.S. at 313, n. 7, 101 S.Ct. at 1790, n. 7. Finally, we note that California may have a substantial interest in applying its own nuisance laws to this case which involves primarily state law claims. See Little Lake Misere, 412 U.S. at 599, 93 S.Ct. at 2400; Wallis v. Pan American Petroleum Corporation, 384 U.S. at 68, 86 S.Ct. at 1304. Consequently, our case does not involve the same sort of rights and obligations of the United States as sovereign which required application of federal law in Little Lake Misere and Clearfield Trust.
 
 
 37
 Rather, our case is more analogous to the Texas Industries case, where the Court decided that a right to contribution among antitrust wrongdoers did not implicate "uniquely federal interests" of the kind that oblige courts to formulate federal common law. In so holding, the Court reasoned "that contribution among antitrust wrongdoers does not involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority." Texas Industries, 451 U.S. at 642, 101 S.Ct. at 2068. Similarly, because our case also does not involve any of the requisite "uniquely federal interests," we decline to recognize the appellants' federal common law nuisance claim based on air pollution.
 
 
 38
 (b) Interstate Dispute
 
 
 39
 The district court accepted the allegations that dust storms "pollute not only the air of California but also that of Nevada" (District Court Order at p. 22), and concluded that the plaintiff had stated a federal common law nuisance claim based on air pollution. We disagree.
 
 
 40
 Assuming that air pollution reaches into Nevada, this case does not involve the kind of interstate dispute previously recognized as requiring resolution under federal law, namely, a controversy whose interstate nature makes "it inappropriate for state law to control." Texas Industries, 451 U.S. at 641, 101 S.Ct. at 2067.
 
 
 41
 In Georgia v. Tennessee Copper Company, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907), the State of Georgia sought to enjoin the Tennessee Copper Company from "discharging noxious gas from their works in Tennessee over the plaintiff's territory." Id. at 236, 27 S.Ct. at 619. Although the Supreme Court did not explicitly state that it was creating a federal common law nuisance cause of action based on air pollution, the Court did enjoin the copper company's continued pollution of Georgia's air. The Court focused on the facts that the plaintiff was a state and the injury was interstate, rather than domestic, in nature: "[i]t is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted on a great scale ... and whatever domestic destruction [the forests] have suffered, should not be further destroyed or threatened by acts of persons beyond its control...." Id. at 238, 27 S.Ct. at 619.
 
 
 42
 In Milwaukee I, supra, the Court recognized a federal common law action for water pollution caused by Wisconsin sewerage commissions polluting Lake Michigan. Again, the case centered on an interstate controversy which involved a state suing sources outside its domain which were causing pollution within the state. The Court concluded that: "[f]ederal common law and not the varying common law of the individual states, is, we think, entitled and necessary to be recognized as a basis for dealing in a uniform standard with the environmental rights of a state against improper impairment by sources outside its domain." Id., 406 U.S. at 107, n. 9, 92 S.Ct. at 1395, n. 9, quoting Texas v. Pankey, 441 F.2d 236, 241-42 (10th Cir.1971).
 
 
 43
 The great similarity between these cases underscores the limited context in which the Court has been willing to recognize a federal common law nuisance claim based on air pollution due to an interstate dispute. It appears that the Court considers only those interstate controversies which involve a state suing sources outside of its own territory because they are causing pollution within the state to be inappropriate for state law to control, and therefore subject to resolution according to federal common law.
 
 
 44
 Therefore, true interstate disputes require application of federal common law. See Milwaukee I, 406 U.S. at 107, n. 9, 92 S.Ct. at 1395, n. 9; Georgia v. Tennessee Copper, 206 U.S. at 237, 27 S.Ct. at 619; Missouri v. Illinois, 200 U.S. at 520, 521, 26 S.Ct. at 269, 270. Because we conclude this is essentially a domestic dispute and therefore not the sort of interstate controversy which makes application of state law inappropriate, reliance on federal common law is unnecessary. Audubon cannot rely on the federal common law of nuisance to state its air pollution claim.
 
 
 45
 Although we recognize that this case could develop into a dispute involving conflicting rights of States, that is not the case before this court, and we do not decide legal questions based on contingencies, speculation or potential conflicts. See Reserve Mining Co. v. Environmental Protection Agency, 514 F.2d 492, 520-21 (8th Cir.1975) (en banc); Committee for Consideration of Jones Falls Sewage System v. Train, 539 F.2d 1006, 1008 (4th Cir.1976) (en banc). Because we conclude that Audubon cannot properly assert a federal common law nuisance action based on air pollution on these facts, we need not decide whether or not such a cause of action would be preempted by the Clean Air Act, or whether Audubon would have standing to assert this claim.
 
 B. Remand of the Pendent State Claims
 
 46
 Audubon has appealed the district court's decision to remand its state claims to state court. Audubon argues that the district court abused its discretion in remanding these claims.
 
 
 47
 Generally, remand orders are not considered final orders reviewable by appeal. Thermtron Products, Inc. v. Hermansdorfer, 423 U.S. 336, 352-53, 96 S.Ct. 584, 593-94, 46 L.Ed.2d 542 (1976); 28 U.S.C. Sec. 1291 (1987). However, in this case the district judge certified his decision and, therefore, 28 U.S.C. Sec. 1292 (1987) permits this court to review the remand order.
 
 
 48
 The district court remanded this action to state court after the original basis for removal was deleted in an amendment intended to defeat federal jurisdiction. In Carnegie-Mellon University v. Cohill, --- U.S. ----, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), the Supreme Court held that "the pendent jurisdiction doctrine supports giving a district court discretion to remand when the exercise of pendent jurisdiction is inappropriate." Id. at 619. While it is not clear whether we review such a remand order under the abuse of discretion standard or the clearly erroneous standard, see Survival Systems Division of the Whittaker Corp. v. United States District Court, 825 F.2d 1416, 1419, n. 2 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988), we affirm the district court's decision to remand because it satisfies both standards.
 
 
 49
 The district judge remanded the state claims to state court because he thought the state judiciary was better suited to decide the state law issues. As the district court stated:
 
 
 50
 "Because this court believes that the parties are entitled to the more 'sure-footed reading of applicable law' (United Mine Workers v. Gibbs, 383 U.S. 715, 726 [86 S.Ct. 1130, 1139, 16 L.Ed.2d 218] (1966)) that a state court can render on state law, I believe a severing of the pendent claims from the federal common law claim and remand of the state claim is appropriate ... state law, especially in an area as critical to the state's well-being as in the instant case, is better left to the state judiciary." (District Court Order at p. 35).
 
 
 51
 Although the federal court has made a substantial commitment of judicial resources to the state claims up to this point in the litigation, this is just one factor the court had the discretion to consider in making its decision to remand. Considering the strong state interest in deciding these complex state law issues identified by the district court, we uphold the district court's remand order.
 
 III
 CONCLUSION
 
 52
 Appellees' federal common law nuisance claim based on water pollution is preempted by the FWPCA and we affirm the district court in that holding. Additionally, we decline to recognize the federal common law nuisance claim based on air pollution because this case does not involve either the rights and obligations of the United States as sovereign, or an interstate dispute making application of state law inappropriate. Accordingly, we reverse the district court's holding that Audubon could state a federal common law nuisance claim for air pollution and therefore we need not decide whether the air pollution claim was preempted by the Clean Air Act. Finally, we have jurisdiction to review this remand order and uphold the district court's decision to remand the state claims to state court. Accordingly, we vacate the judgment and remand to the district court for its remand of the entire case to the state court.
 
 
 53
 AFFIRMED IN PART, VACATED AND REMANDED.
 
 REINHARDT, Circuit Judge, dissenting:
 
 54
 In this action, originally filed nine years ago, Audubon invokes the federal common law of nuisance to halt the Department of Water and Power's diversion of fresh water streams. The water the Department currently redirects to Los Angeles would in the normal course flow into Mono Lake. Audubon alleges that this diversion, by lowering the level of the lake, has caused water pollution, in the form of increased salinity of the lakewater, and air pollution, in the form of dust storms rising from the uncovered lake bed. Audubon's nuisance action is based on this pollution, which Audubon asserts will persist and intensify if the diversion continues. The majority has denied Audubon's right to present its claims, holding that its water pollution claim is preempted and its air pollution claim is not cognizable.
 
 
 55
 I agree with the majority that, under Supreme Court precedent, we must hold Audubon's water pollution claim preempted. However, I disagree with the majority's analysis of the legal issues affecting Audubon's air pollution claim and believe that Audubon has a right to pursue that part of its action. The Supreme Court has stated unequivocally that there is an overriding federal interest in clean air and that, consequently, air pollution is governed by federal common law. I believe the existence of this federal interest is sufficient to give Audubon standing to assert its air pollution claim. Moreover, the claim is not preempted by the Clean Air Act, 42 U.S.C. Secs. 7401-7642 (1982).
 
 
 56
 1. Cause of Action for Air Pollution Under Federal Common Law
 
 
 57
 Federal common law has long been recognized as a source of the federal courts' authority to protect federal interests. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957) ("It is not uncommon for federal courts to fashion federal law where federal rights are concerned."). "[T]he remedies which Congress provides are not necessarily the only federal remedies available." Illinois v. City of Milwaukee, 406 U.S. 91, 103, 92 S.Ct. 1385, 1392, 31 L.Ed.2d 712 (1972) ("Milwaukee I "). As the majority notes, the cases that necessitate resort to federal common law are few and far between. Majority op. at 1413; see City of Milwaukee v. Illinois and Michigan, 451 U.S. 304, 313-14, 101 S.Ct. 1784, 1790-91, 68 L.Ed.2d 114 (1981) ("Milwaukee II "). The majority correctly identifies a critical category of federal common law cases: those in which Congress has spelled out a "uniquely federal interest[ ]." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed. 804 (1964). The majority errs, however, in assuming that in order to implicate a federal interest, there must also be either a "right or obligation of the United States" or an "interstate dispute implicating the conflicting rights of states." Majority op. at 1414, 1416-17. The Supreme Court has already identified air quality as a matter of uniquely federal interest. That is a sufficient basis for invoking the federal common law of nuisance.
 
 
 58
 The existence of a federal interest provided the basis for the Supreme Court's holding in Milwaukee I allowing plaintiffs to file a common law nuisance claim for water pollution. In that case, the Court stated unequivocally that there is a federal interest in purity of air and water. The Court noted that federal common law applies "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism." 406 U.S. at 105 n. 6, 92 S.Ct. at 1393 n. 6. In examining the nature of the federal interest in that case, the Court relied on both water pollution and air pollution cases. See id. at 104, 106-07, 92 S.Ct. at 1394-95. The Court concluded, "When we deal with air and water in their ambient or interstate aspects, there is a federal common law." Id. at 103, 92 S.Ct. at 1392 (emphasis added).[1] Thus, in the absence of a preemptive federal statute, "federal courts will be empowered to appraise the equities of the suits alleging creation of a public nuisance" by pollution. Id. at 107, 92 S.Ct. at 1395.
 
 
 59
 The federal interest established by the Supreme Court in Milwaukee I was not affected by its decision in Milwaukee II. The second opinion did not question the existence of a federal interest in clean air and water or repudiate the position taken by the Court in Milwaukee I that air and water pollution are governed (in the absence of an all-encompassing federal statute) by federal common law. It dealt solely with the question of preemption of the water pollution claim as a result of the amendments to the Federal Water Pollution Control Act that were enacted after Milwaukee I. See Milwaukee II, 451 U.S. at 310 n. 4, 101 S.Ct. at 1789 n. 4 ("the issue before us is simply whether federal legislation has supplanted federal common law"). The Court found that by virtue of the post-Milwaukee I amendments, Congress had occupied the field in the area of water pollution. The common law claim was therefore precluded. Id. at 317, 101 S.Ct. at 1792.
 
 
 60
 Here, the majority does not contend that Congress has occupied the field with respect to air pollution. See majority op. at 1415. Rather, it mistakenly asserts that there is no federal interest in air pollution warranting the application of federal common law. Id. Its attempt to distinguish Milwaukee I, see id. at 1414-15, is unpersuasive. It is true that Milwaukee I was a water pollution case. But the Milwaukee I Court relied on both water pollution and air pollution cases for a good reason: The Court's expressed rationale for finding that federal common law governed, namely the need for a uniform rule of decision, applies equally to both types of pollution. The majority does not state any grounds for its apparent belief that there is a uniquely federal interest in preserving the purity of our lakes and streams but not the purity of our air. Nor does it suggest why the first should be subject to uniform federal law and the second to a patchwork of state rules. I do not believe the pronouncements of the Court should be treated so lightly. The Court carefully considered this issue and made its view of the law clear. Where we have no rationale for distinguishing the Court's position, I believe we should follow its lead. See note 11 infra.
 
 
 61
 In Milwaukee I the Court declined to assert original jurisdiction but approved the filing of claims in federal district courts. It appears the Court believed that pollution control techniques must be tailored to local conditions, and also that pollution is a matter primarily for federal rather than state regulation; finally, for purposes of federal common law, the Court equated air and water pollution. The majority's statement that the federal interest in air quality "does not necessarily involve the authority and duties of the United States as sovereign to the extent that our federal system requires that the controversy be resolved under federal law," majority op. at 1415, is simply and clearly in direct contradiction of the Supreme Court's statements in Milwaukee I.[2]
 
 
 62
 Contrary to the majority's suggestion that the Clean Air Act implicitly recognizes that federal common law is inapplicable, the provisions of that Act serve to demonstrate that there is a uniquely federal interest in air quality. The Clean Air Act is very similar in structure to the Federal Water Pollution Control Act (FWPCA) which was in effect at the time of the Milwaukee I decision. See section 3 infra. In Milwaukee I, the Court examined the history of federal regulation of water pollution, culminating in the FWPCA, and concluded that federal, not state, law controls water pollution. 406 U.S. at 102, 92 S.Ct. at 1392. Federal regulation of air pollution under the Clean Air Act is at least as extensive vis-a-vis state regulation as was federal regulation of water pollution under the old FWPCA. For example, for those types of pollutants regulated by the Clean Air Act, it is the federal government, not the states, that establishes national air quality standards. 42 U.S.C. Sec. 7409 (1982); see Milwaukee I, 406 U.S. at 102, 92 S.Ct. at 1392 (under the FWPCA, "[w]hile the States are given time to establish water quality standards, ... if a State fails to do so the federal administrator promulgates one"). The federal government regulates those air pollutants emitted by mobile and stationary sources that "may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. Sec. 7408(a)(1)(A) (1982); see Milwaukee I, 406 U.S. at 102, 92 S.Ct. at 1392 (under the FWPCA, water pollution is "subject 'to abatement' when it 'endangers the health or welfare of any persons' "). The Clean Air Act authorizes the Administrator of the federal Environmental Protection Agency to bring civil actions for non-compliance with the Act. 42 U.S.C. Sec. 7413(b) (1982); see Milwaukee I, 406 U.S. at 103, 92 S.Ct. at 1392 (under the FWPCA, "the Attorney General may bring suit on behalf of the United States for abatement of the pollution"). Thus, just as the FWPCA was evidence of a uniquely federal interest in water pollution, the Clean Air Act evidences a similar federal interest in air pollution.[3]
 
 
 63
 The majority acknowledges that the EPA has recently undertaken to regulate the very sort of non-point source air pollution that is at issue in this case. Majority op. at 1414. A more direct statement of a federal interest in wind-borne air pollution cases is difficult to imagine. However, the majority concludes that "[n]othing in the Clean Air Act suggests Congress intended to rely for enforcement of this Act upon a federal common law remedy." Id. at 1414. But this is not relevant to the question whether a federal interest if involved. The scope of the Clean Air Act is, of course, relevant to the preemption issue, see Section 3 infra, a question the majority does not reach. Majority op. at 1417.
 
 
 64
 Because a federal interest is implicated, I believe that the pollution need not also be interstate in nature. This interpretation is supported by the disjunctive language employed in Milwaukee I. There, the Supreme Court held that federal law "controls the pollution of interstate or navigable waters" and that federal common law governs "air and water in their ambient or interstate aspects." Id., 406 U.S. at 102-03, 92 S.Ct. at 1392 (emphasis added). The purpose of actions under federal common law, as articulated in Milwaukee I, is not only to protect interests of federalism, but also to effectuate "overriding federal interests." See id. at 105 n. 6, 92 S.Ct. at 1393 n. 6. The federal interest in clean air and water, which Congress established and the Supreme Court has affirmed, is not affected by state boundaries; the ability of the federal courts to protect that interest should not depend on whether the prevailing winds are strong enough to carry polluted air from the Mono Lake area into Nevada.
 
 
 65
 The Seventh Circuit adopted this view of federal common law in Outboard Marine, upholding a nuisance action against an in-state polluter brought by the state of Illinois.[4] The court emphasized the language of Milwaukee I, noting: "The Court's use of the term 'navigable waters' significantly suggests the breadth of the holding, for that term includes both the territorial seas and purely intrastate waters having no necessary interstate impact." 619 F.2d at 626-27 (footnote omitted). The court also declared that the need for uniform rules of decision, discussed in Milwaukee I, is equally strong whether or not the pollution has interstate effects. Id. at 628; see also National Sea Clammers Association v. City of New York, 616 F.2d 1222, 1234 n. 35 (3d Cir.1980), rev'd on grounds of preemption sub nom. Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1981). The court ended by stating,
 
 
 66
 We conclude, based on Illinois v. Milwaukee and the Federal Water Pollution Control Act, that there is an overriding federal interest in preserving, free of pollution, our interstate and navigable waters. When a pollution controversy arises, it is immaterial whether there is a showing of extraterritorial pollution effects. The issue is whether the dispute is a matter of federal concern. When it is, as in this case, federal courts should be accessible.
 
 
 67
 Id. at 630.[5] In view of Milwaukee I 's language regarding ambient air, as well as the provisions of the Clean Air Act, I believe the Seventh Circuit's holding is equally applicable to air pollution. I conclude that because of the federal interest in the quality of ambient air, Audubon has stated a claim under the federal common law of nuisance.
 
 
 68
 The majority also holds that, because only California parties are present, this controversy is a "purely domestic dispute" rather than an interstate dispute and therefore is not governed by federal common law. See majority op. at 1416. Because I believe this issue is at heart one of standing, I discuss it in the following section.
 
 2. Standing
 
 69
 The majority suggests that federal common law applies only to "those interstate controversies which involve a state suing [pollution] sources outside of its own territory." Majority op. at 1416. The majority appears to confuse the question of under what circumstances a cause of action for nuisance exists under federal common law with the question of who has standing to bring such an action. It cites no support for limiting standing in federal common law nuisance actions to state complainants. Rather, it contents itself with citing examples of cases in which a state was a party. But while past federal common law nuisance actions have largely involved state complainants, nothing in prior Supreme Court holdings precludes an injured private party from maintaining an action such as the one before us.
 
 
 70
 While the Supreme Court has never decided whether a private plaintiff may bring an action under the federal common law of nuisance, the language of Milwaukee I suggests that the presence of a state complainant is not required. While Milwaukee I involved a state plaintiff, the Supreme Court specifically held that "it is not only the character of the parties that requires us to apply federal law." 406 U.S. at 105 n. 6, 92 S.Ct. at 1393 n. 6. Rather, the Court said, federal common law applies "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism." Id.
 
 
 71
 The Third Circuit has squarely decided the question whether private parties may file federal common law nuisance actions. It held that they may, relying on the Supreme Court's statements in Milwaukee I regarding the need for uniformity. See National Sea Clammers Association v. City of New York, 616 F.2d 1222, 1234 (3d Cir.1980), rev'd on grounds of preemption sub nom. Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).[6] "In order to give full effect to the federal common law of nuisance recognized in [Milwaukee I ]," the court held, "private parties should be permitted, and indeed encouraged, to participate in the abatement of such nuisances." 616 F.2d at 1234. In this way, the purposes of the remedy as set forth in Milwaukee I can bemore fully carried out. See id.[7] It is also significant that the federal pollution control statutes allow for private enforcement. See 33 U.S.C. Sec. 1365 (1982); 42 U.S.C. Sec. 7604. The fact that private parties as well as governmental entities can seek statutory remedies against pollution suggests that both types of plaintiffs (or neither) can seek remedies against pollution not covered by the statutes.
 
 
 72
 Moreover, although the Supreme Court has not addressed the issue of private party standing in the federal common law nuisance context, it has held that other federal common law remedies are available to private plaintiffs. In Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938), for example, the Court held that apportionment of the waters of an interstate stream was a matter of federal common law. 304 U.S. at 110, 58 S.Ct. at 811. The Court went on to hold that the issue could be decided in a suit between private litigants, rejecting the argument that because the states concerned were not parties and could not be joined, the Court lacked jurisdiction. Id. at 110-11, 58 S.Ct. at 810-11; see also Banco Nacional, 376 U.S. at 426-27, 84 S.Ct. at 939-40 (involvement of private parties does not affect intrinsically federal nature of interests). There is no authority or rationale for departing from the general rule in this case, and the majority has offered none beyond the fact that the Supreme Court has not had occasion to decide the question in a nuisance context. Under the circumstances, the arguments weigh in favor of allowing Audubon to pursue its claim.[8]
 
 
 73
 While the majority discusses the necessity for state plaintiffs at some length, ultimately it appears to base its holding on the fact that this case involves only California parties. See majority op. at 1416-1417. Again, the majority appears to confuse the question whether a cause of action exists with the question whether these plaintiffs may maintain such an action. As I understand the issue on which the majority bases its decision, it is: whether a plaintiff in State A may sue for the abatement of a nuisance that arises in State A but affects State B as well, or whether only a State B plaintiff has standing. To put it differently the question raised by the majority appears to be whether, if interstate effects are a necessary element of the cause ofaction, a citizen of the state in which the nuisance originates has standing. Because I believe that interstate effects are not a necessary element of a federal common law action where a federal interest exists, I need not decide the question.[9] I conclude that Audubon has standing to bring this claim under the federal common law of nuisance.
 
 3. Preemption
 
 74
 The most difficult question in this case is one the majority does not answer: whether Audubon's air pollution claim is preempted by the Clean Air Act.[10] Although a close question, application of the Milwaukee II preemption analysis indicates that Audubon's claim is not preempted.[11] As elaborated by the Supreme Court in Milwaukee II, the question of statutory preemption of federal common law "involves an assessment of the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law." 451 U.S. at 315 n. 8, 101 S.Ct. at 1792 n. 8. In order to preempt common law, the legislative scheme must speak directly to a question, id. at 315, 101 S.Ct. at 1791; "[w]hen Congress has not spoken to a particular issue," federal common law applies. Id. at 313, 101 S.Ct. at 1790; see also County of Oneida, New York v. Oneida Indian Nation of New York State, 470 U.S. 226, 237, 105 S.Ct. 1245, 1253, 84 L.Ed.2d 169 (1985). The Clean Water Act preempted federal common law because it was "an all-encompassing program of water pollution regulation." Milwaukee II, 451 U.S. at 318, 101 S.Ct. at 1793.
 
 
 75
 The legislative purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. Sec. 7401(b)(1) (1982). However, the Act is not, as I have noted, an "all-encompassing program" of pollution regulation comparable to the Clean Water Act.[12] Under the latter statute, "[e]very point source discharge is prohibited unless covered by a permit." Milwaukee II, 451 U.S. at 318, 101 S.Ct. at 1793 (emphasis in original) (footnote omitted). But as the Second Circuit has explained, the regulatory scheme of the Clean Air Act is less comprehensive than that of the Clean Water Act in that the former statute does not control emissions from every source, but only from those sources that are found to threaten the air quality standards promulgated by the EPA. New England Legal Foundation v. Costle, 666 F.2d 30, 32 n. 2 (2d Cir.1981).[13]
 
 
 76
 In fact, the structure of the Clean Air Act is closer to that of the pre-1972 Federal Water Pollution Control Act (FWPCA)--which the Supreme Court held in Milwaukee I did not preempt federal common law, 406 U.S. at 107, 92 S.Ct. at 1395--than it is to that of the Clean Water Act. Prior to the 1972 amendments, the FWPCA "employed ambient water quality standards specifying the acceptable levels of pollution in a State's interstate navigable waters as the primary mechanism in its program for the control of water pollution." Those standards were to be achieved through implementation plans designed by the states. See EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 202 & n. 4, 96 S.Ct. 2022, 2023 & n. 4, 48 L.Ed.2d 578 (1976). That approach was rejected in 1972 in favor of the effluent limitations and discharge permit system of the current Clean Water Act. 33 U.S.C. Secs. 1311, 1342 (1982); see EPA v. California, 426 U.S. at 204-05, 96 S.Ct. at 2024-25.
 
 
 77
 However, no similar changes were made in the Clean Air Act. That statute continues to rely primarily on national air quality standards that are implemented through state plans. See 42 U.S.C. Secs. 7409, 7410 (1982).[14] The Clean Air Act, like the old FWPCA, focuses on establishing the tolerable levels of pollutants in the environment, while the Clean Water Act focuses on regulating all discharges of pollutants. The Clean Air Act "tightens control" over emissions "so as not to lower applicable [air] quality standards." See Milwaukee I, 406 U.S. at 101, 92 S.Ct. at 1392 (describing FWPCA). But unlike the Clean Water Act, it does not establish a "comprehensive" regulatory program; it still leaves room, as did the old FWPCA, for the federal courts "to improve on [its] program with federal common law." See Milwaukee II, 451 U.S. at 319, 101 S.Ct. at 1793.
 
 
 78
 The analysis does not change because the EPA has recently begun to regulate the type of non-point source air pollution at issue in this case. See 40 C.F.R. Secs. 50.6, 50.7 (1987) and 40 C.F.R. Part 50, Appendix J & K (1987). See also 52 Fed.Reg. 24716 (July 1, 1987). In Milwaukee I, the FWPCA also regulated the type of pollution which the plaintiff was seeking to have abated. 406 U.S. at 102, 92 S.Ct. at 1392. Because the remedy the plaintiff sought was "not within the precise scope" of those prescribed by the FWPCA, id., and because the FWPCA (as constituted at the time Milwaukee I was decided) was not all-encompassing, Milwaukee II, 451 U.S. at 317-18 & n. 10, 101 S.Ct. at 1793 & n. 10, the Court concluded that the federal common law of nuisance was still applicable. Milwaukee I, 406 U.S. at 103-08 92 S.Ct. at 1392-95. As the Clean Air Act itself is not all-encompassing, and indeed is similar in scope to the version of the FWPCA considered in Milwaukee I, see supra at 1422-23, the mere fact that the EPA is regulating wind-borne air pollution is not sufficient to compel a conclusion that the Act preempts federal common law.[15]
 
 
 79
 Permitting federal common law nuisance actions for air pollution would not disrupt the regulatory scheme of the Clean Air Act. Rather, doing so would allow us to supplement and improve on the statutory scheme, as Milwaukee I held was permitted. Unlike the Clean Water Act, the Clean Air Act is not "all-encompassing"; it is far more like the statute held not preemptive in Milwaukee I. Thus, in my opinion, the Clean Air Act does not preclude an air pollution claim under the federal common law of nuisance.
 
 4. Conclusion
 
 80
 Audubon seeks here to raise claims of air and water pollution at Mono Lake under the federal common law of nuisance. Congress has declared, and the Supreme Court has found, that the elimination of such pollution is an overriding federal interest. Contrary to the majority's view, it is the job of the federal courts to use federal common law to effectuate that interest, at least where Congress has not preempted the field by "all-encompassing" legislation. Congress has done so in the area of water pollution but, in my opinion, not in the area of air pollution.
 
 
 81
 Moreover, because Audubon's suit raises a matter of federal interest, I disagree with the majority that the action must also either involve a federal right or obligation, or constitute an interstate dispute implicating the conflicting rights of states. I believe it is not necessary to meet either of these additional requirements if a federal interest is present. Even those courts that have suggested that a federal interest is insufficient in itself have required only that the pollution have interstate effects. Here, that requirement is satisfied because Audubon has alleged that the air pollution caused by the Mono Lake diversion extends into Nevada.
 
 
 82
 Private parties, as well as states, may assert a federal interest whether or not interstate effects are a necessary element of the cause of action. Because I do not believe that a showing of interstate effects is required, I need not decide whether standing in this case is limited to Nevada residents. Were I to reach that question, however, I would answer it in the negative and conclude that Audubon has standing to pursue its claim.
 
 
 83
 For these reasons, I disagree with the majority's dismissal of Audubon's air pollution claim. I respectfully dissent.
 
 
 
 *
 Judge Goodwin was drawn to replace Judge Kennedy. He has read the briefs, reviewed the record and listened to the tape of oral argument held on 4/18/86
 
 
 [1]
 "Ambient air" is "that portion of the atmosphere, external to buildings, to which the general public has access." 40 C.F.R. Sec. 50.1(e) (1987)
 
 
 [2]
 Nor can the majority escape the Court's reasoning in Milwaukee I by arguing that this case does not involve a "right or obligation" of the United States. See majority op. at 1414. In Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981), the Supreme Court briefly outlined the function of federal common law and listed some of the categories of cases in which that law applies. The uniquely federal interest in air and water pollution discussed by the Court in Milwaukee I does not fit neatly into any of those categories; but that is not a basis for ignoring the Court's holding or analysis. Texas Industries does not purport to, nor does it, undercut the teachings of Milwaukee I
 
 
 [3]
 The Milwaukee I Court also cited other federal statutes as evidence of the existence of a federal interest. See 406 U.S. at 101-02, 92 S.Ct. at 1391-92. If anything, the federal interest in clean air and water has become even more apparent since Milwaukee I as Congress has approved further legislation in this area. In addition to reauthorizing and amending both the Clean Air Act and the Federal Water Pollution Control Act, Congress enacted new environmental legislation such as the Coastal Zone Management Act of 1972, 16 U.S.C. Secs. 1451-1464 (1982 & Supp. IV, 1986), and the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. Secs. 1401-1445 (1982). By these actions, Congress reaffirmed its intent to protect our environment against the "irreversible perturbations" caused by human activity. H.R.Rep. No. 911, 92d Cong., 2d Sess. 77 (1972), reprinted in 1 Legislative History of the Water Pollution Control Act of 1972, at 764 (1973)
 
 
 [4]
 Outboard Marine was ultimately dismissed on grounds of preemption. People of the State of Illinois v. Outboard Marine Corp., Inc., 680 F.2d 473 (7th Cir.1982). However, the Seventh Circuit's reasoning remains sound
 
 
 [5]
 In contrast to the Seventh Circuit, some courts have dismissed federal common law nuisance claims where the plaintiffs failed to allege interstate pollution effects. See Committee for the Consideration of the Jones Falls Sewage System v. Train, 539 F.2d 1006, 1009-10 (4th Cir.1976); Reserve Mining Co. v. EPA, 514 F.2d 492,520 (8th Cir.1975) (en banc), modified on other grounds sub nom. Reserve Mining Co. v. Lord, 529 F.2d 181 (8th Cir.1976); see also Parsell v. Shell Oil Co., 421 F.Supp. 1275, 1281 & n. 15 (D.Conn.1976), aff'd mem. sub nom. East End Yacht Club, Inc. v. Shell Oil Co., 573 F.2d 1289 (2d Cir.1977). For the reasons already stated, I disagree with the reasoning of those courts. See Outboard Marine, 619 F.2d at 628-29 (declining to adopt reasoning of Fourth and Eighth Circuits). But even if interstate pollution effects were required for the application of federal common law, Audubon would meet that test. Audubon has alleged that the dust storms rising from the uncovered bed of Mono Lake pollute the air of Nevada as well as that of California, and for purposes of this appeal we must accept that allegation as true
 
 
 [6]
 Again, while the claim was later held preempted, the Third Circuit's reasoning on the issue of private party standing remains valid. The Supreme Court expressly reserved judgment on the question. Sea Clammers, 453 U.S. at 21, 101 S.Ct. at 2627
 
 
 [7]
 In Jones Falls, the Fourth Circuit noted the absence of a state complainant, but it is unclear what role that factor played in the court's dismissal of the federal common law nuisance claim. See 539 F.2d at 1009-10. In an opinion summarily affirmed by the Second Circuit, a district court noted that the federal common law nuisance claims decided by the Supreme Court had involved state parties, but did not squarely hold that private parties were not permitted. See Parsell, 421 F.Supp. at 1280-81. Another district court allowed a federal common law nuisance action brought by private plaintiffs to proceed without discussing the issue of private party standing. Byram River v. Village of Port Chester, New York, 394 F.Supp. 618 (S.D.N.Y.1975). These are the only cases of which I am aware that have involved federal common law nuisance actions brought by private plaintiffs. In short, one court of appeal has held that private parties have standing to bring federal common law nuisance claims; so far as I know, no court has squarely held that they do not
 Courts have also decided federal common law nuisance claims in which the plaintiff was a political subdivision of a state, see City of Evansville, Indiana v. Kentucky Liquid Recycling, Inc., 604 F.2d 1008 (7th Cir.1979); Township of Long Beach v. City of New York, 445 F.Supp. 1203 (D.N.J.1978), or the federal government, see United States v. Stoeco Homes, Inc., 498 F.2d 597 (3d Cir.1974), cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); United States ex rel. Scott v. United States Steel Corp., 356 F.Supp. 556 (N.D.Ill.1973).
 
 
 [8]
 The plaintiffs meet the remaining requirements for standing. Members of the plaintiff associations as well as the individual property-owners have alleged particularized, "distinct and palpable" injuries that are directly traceable to the diversion of fresh water flows from Mono Lake by the Department of Water and Power. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). These injuries would be redressed if the diversion were to cease. See Allen, 468 U.S. at 751, 104 S.Ct. at 3324. Moreover, the continuation of the diversion threatens further injury to the plaintiffs in the future. See National Resources Defense Council, Inc. v. Hodel, 618 F.Supp. 848, 853 (E.D.Cal.1985). No prudential considerations argue against the plaintiffs' standing in this case. Thus, there is no reason to deny the plaintiffs the right to pursue their claim
 
 
 [9]
 If allegations of interstate pollution effects are required for a federal common law nuisance claim based on a federal interest, see note 61 supra, I would still conclude that the plaintiffs have standing. The reason for requiring interstate effects appears to be the belief that federal common law should be invoked only where the controversy involves pollution of more than purely local significance or impact. See Jones Falls, 539 F.2d at 1009 ("[t]his intrastate controversy is entirely local"); Reserve Mining, 514 F.2d at 521-22 & n. 54 (noting evidence showed no significant interstate pollution effects). Once the pollution meets that standard, it makes no difference in which state the plaintiffs reside; the impact of the pollution is still the same. The majority's argument, that federal common law applies only if there is a dispute between parties from different states, is simply a throwback to the theory that there must be an "interstate dispute implicating the conflicting rights of states" in order to invoke federal common law. That argument has no relevance to the question of who has standing to bring a federal interest claim, even assuming that interstate effects are a necessary element of such a claim
 
 
 [10]
 I agree with the majority that Audubon's water pollution claim is preempted. The Supreme Court stated in Milwaukee II that "at least so far as concerns the [water pollution nuisance] claims of respondents, Congress ... has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." 451 U.S. at 317, 101 S.Ct. at 1792. That same term, the Court declared, "The Court has now held that the federal common law of nuisance in the area of water pollution is entirely pre-empted by the more comprehensive scope" of the revised Clean Water Act. Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 21-22, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981) (citing Milwaukee II ). The latter statement seems to extend beyond the holding of Milwaukee II. But while these statements arguably amount only to dicta (since both cases involved the particular type of water pollution regulated by the statute--the discharge of pollutants into navigable waters), I recognize that the language of Sea Clammers is unequivocal
 We faced a similar situation in United States v. Beale, 736 F.2d 1289 (9th Cir.1984) (en banc). The Supreme Court had made certain statements regarding the fourth amendment implications of dog sniffs, statements that were arguably unnecessary to the resolution of its case. United States v. Place, 462 U.S. 696, 706-07, 103 S.Ct. 2637, 2644-45, 77 L.Ed.2d 110 (1983). Shortly afterward, the Court characterized its earlier statements as a holding. United States v. Jacobsen, 466 U.S. 109, 123, 104 S.Ct. 1652, 1662, 80 L.Ed.2d 85 (1984). We held: "Whether or not the statement in Place was a holding or dictum, the Supreme Court has clearly directed the lower courts to follow its pronouncement." 736 F.2d at 1291. The situation is the same here. Given the strength of the Court's initial statement and the even stronger and deliberate repetition of its view shortly afterward, I believe we are compelled to follow the pronouncements of Milwaukee II and Sea Clammers.
 
 
 [11]
 We previously held that neither the Clean Air nor Clean Water Act precluded a federal common law nuisance claim. California Tahoe Regional Planning Agency v. Jennings, 594 F.2d 181, 193 (9th Cir.1979). However, because that case was decided before Milwaukee II, its precedential value is limited and the issues must be reanalyzed in light of the later Supreme Court decision
 
 
 [12]
 We have previously commented that the Clean Air Act "was intended comprehensively to regulate, through guidelines and controls, the complexities of restraining and curtailing modern day air pollution." Bunker Hill Co. Lead and Zinc Smelter v. EPA, 658 F.2d 1280, 1284 (9th Cir.1981). However, this "passing observation," cf.id., was not made in a preemption context and we did not examine the statute's regulatory scheme or look to see whether the statute addressed a particular problem. Accordingly, I do not believe that we intended our observation to constitute a definitive ruling on the critical preemption question at issue here
 
 
 [13]
 The Second Circuit did not reach "the broad question of whether the Clean Air Act totally preempts federal common law nuisance actions based on the emission of chemical pollutants into the air." 666 F.2d at 32. But see Reeger v. Mill Service, Inc., 593 F.Supp. 360, 363 (W.D.Pa.1984) (regulatory scheme of Clean Air Act "similar" to that of Clean Water Act, therefore "same principle of preemption" applies); United States v. Kin-Buc, Inc., 532 F.Supp. 699, 702 (D.N.J.1982) (common law of nuisance preempted because "Congress has addressed the problem of air pollution")
 
 
 [14]
 The Clean Air Act does impose emission limitations on mobile sources and new stationary sources. See 42 U.S.C. Secs. 7411, 7521 (1982). But even in those contexts, the Act does not use a comprehensive permit system like the one that applies to water pollution. Rather, new stationary sources are subject to "performance standards" that reflect the current state of pollution control technology. See id. Sec. 7411. The new source performance standards are intended to supplement, not replace, the ambient air quality standards. Natural Resources Defense Council, Inc. v. Train, 545 F.2d 320, 326 (2d Cir.1976). Thus, the air quality standards remain the primary method of air pollution control
 
 
 [15]
 We note that the EPA's regulations "may provide useful guidelines in fashioning ... rules of decision." Milwaukee I, 406 U.S. at 103, 92 S.Ct. at 1392 n. 5