**SAVE OUR SUMMERS, and Tim K, by and through his parents and guardians, Patti G. and Jeffery K., and Alex H., by and through her parents and guardians, Trina H. and James H., Plaintiffs,**

v.

**WASHINGTON STATE DEPARTMENT OF ECOLOGY, and Tom Fitzsimmons, Director, Defendants.**

No. CS–99–269–RHW.

United States District Court,
E.D. Washington.

Oct. 8, 1999.

Order Denying Reconsideration,
Sept. 14, 2000.

Karen S Lindholdt, James L Sheehan, Spokane, WA, for Save Our Summers, Tim K, Patti G, Jeffery K, Alex H, Trina H, James H, Adrienne B, Melanie B, David B, Tyler H, Vicki H, Craig H, Kaley F, Laura F, David F, Vivian Evans, Charles "Ray" Ashley, Eina Fishman, plaintiffs.

Thomas C Morrill, Leslie R Seffern, Attorney General of Washington, Department of Ecology, Olympia, WA, for Washington State Department of Ecology, Tom Fitzsimmons, Director Department of Ecology, defendants.

United States Department of Justice, U.S. Department of Justice, Environment & Natural Resources Division, General Litigation Section, Washington, DC, amicus pro se.

Lee Russell McGuire, Jr, Brock Carpenter & McGuire PS, Davenport, WA, Gary H Baise, Stewart D Fried, Baise Miller & Freer PC, Washington, DC, for Washington Association of Wheat Growers, intervenor.

## ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, INTER ALIA

WHALEY, District Judge.

Two motions are before the Court: Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Ct. Rec.2), and Plaintiffs' Motion for an Overlength Memo in Support of Motion for Temporary Restraining Order and Preliminary Injunction (Ct.Rec.4). Oral argument was heard on the motion for a temporary restraining order on October 8, 1999, in Spokane, Washington. Plaintiffs

were represented by Karen Lindholdt and Rachel Paschal. Defendants were represented by Tom Morrill. For the reasons discussed below, the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied.

## INTRODUCTION

If the Court believed it had jurisdiction to hear this claim, it would find that all elements necessary for temporary relief were satisfied, and a temporary restraining order would issue pending a hearing to determine whether preliminary injunction relief was appropriate. However, the Court believes that it has no jurisdiction to entertain the claims, and consequently no authority to restrain the challenged conduct.

First, significant legal questions exist as to whether the Plaintiffs' ADA and Rehabilitation Act claims are foreclosed by the comprehensive congressional scheme to regulate air pollution through the Clean Air Act. The Clean Air Act established a comprehensive mechanism to enforce and amend air pollution regulations; it provides limitations on the type and amount of allowable air pollution, and provides a specific mechanism by which citizens can bring suits to compel agency action to stop pollution. More importantly, the Act strikes two vital balances: first, between the federal government and the states; second, between the recognition that a certain amount of pollution is a necessary by-product of our industrialized society and the need to preserve public health and welfare. If this Court were to enjoin farmers from burning wheat-stubble based on factors outside that Act, factors beyond those considered necessary and important in the comprehensive scheme Congress has adopted, then that scheme and the delicate balances it strikes would be severely undermined.

Second, the Court does not believe that the type of conduct challenged by Plaintiffs (a state agency's failure to enact or enforce restrictions on agricultural burn-ing) is the type of conduct that Congress intended to address in the ADA or the Rehabilitation Act.

## ANALYSIS

*1. Legal standards.*

 The grant or denial of a motion for a temporary restraining order lies within the equitable discretion of the district court. *Chalk v. United States Dist. Ct.*, 840 F.2d 701, 704 (9th Cir.1988). A temporary restraining order is appropriate if the moving party meets one of two alternative standards. *International Jensen, Inc. v. Metrosound U.S.A., Inc.* 4 F.3d 819, 822 (9th Cir.1993) (citing *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir.1987)). An order properly issues under the traditional standard if the court determines that (1) the moving party will suffer irreparable injury if the relief is denied; (2) there is a strong likelihood that the moving party will prevail on the merits at trial; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief. *Id.* at 822; *Byron M. v. City of Whittier*, 46 F.Supp.2d 1032, 1034 (C.D.Cal.1998). Under the "alternative standard," a temporary restraining order properly issues when a party demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Id.* In either case, movants must show the existence of some cognizable danger, more than a mere possibility, of a recurrent violation. *Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir.1997), *quoting, United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

 In deciding whether to grant temporary relief, the court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.

*Byron M.,* 46 F.Supp.2d at 1034. The requirement that a party show a likelihood of irreparable harm prior to trial increases or decreases in inverse correlation to the probability of success on the merits at trial. *Diamontiney v. Borg,* 918 F.2d 793, 795 (9th Cir.1990); *Benda v. Grand Lodge of Int'l Assoc. of Machinists & Aerospace Workers,* 584 F.2d 308 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). *See also,* 11A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2951 at 267 (1995) ("[W]hen the injury that allegedly will result if the restraining order is denied is very grave, less of a showing by the applicant is required than if the injury would be slight.") The essence of the court's inquiry is whether the balance of equities favors granting preliminary relief. *International Jensen,* 4 F.3d at 822.

### 2. Failure to state a claim.

This is a case in which the facts are compelling, and strongly favor the grant of a temporary restraining order. However, the law limits this Court's authority to do so. Even though this Court concludes that Plaintiffs have satisfied all other elements necessary for a temporary restraining order to issue, the Court believes it lacks jurisdiction, and consequently lacks the legal authority to issue the order.

The Court finds that the Plaintiffs have not sufficiently established that they are likely to ultimately prevail on their claim because there may well be no legal basis to bring a claim under the ADA and the Rehabilitation Act when that claim seeks to enforce or change air pollution regulations. Acceptance of such a claim carries with it the implicit finding that Congress amended the Clean Air Act in adopting the ADA and the Rehabilitation Act; such a finding is inappropriate. Furthermore, the type of conduct Plaintiffs seek to have this Court regulate is not the type of conduct Congress intended to cover under the ADA or the Rehabilitation Act.

A suit seeking modification of air pollution control regulations is not properly brought under the ADA or the Rehabilitation Act when a separate, comprehensive statutory scheme exists regarding pollution regulation. Congress has struck a delicate balance between states and the federal government by allocating power and responsibilities among the numerous government bodies involved in regulation of air pollution. A key component of this balance is the ability of private citizens to seek change in or enforcement of pollution regulations through the specific mechanisms set forth in the Clean Air Act. It is not appropriate for this Court to upset the balance that Congress has struck by allowing persons to influence pollution regulation by means outside the relevant statutory framework.

In the Clean Air Act, Congress established a comprehensive federal program to address the problem of air pollution creation and enforcement. *See, e.g., Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 848, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("The Clean Air Act Amendments of 1977 are a lengthy, detailed, technical, complex, and comprehensive response to a major social issue."); *National Audubon Soc. v. Department of Water,* 869 F.2d 1196, 1201 (9th Cir.1988) (same). This scheme rests on cooperation between the federal government and states, and recognizes that although "Federal financial assistance and leadership is essential" to successful control of pollution, "air pollution prevention ... and air pollution control at its source is the primary responsibility of State and local governments." 42 U.S.C. §§ 7401(a)(3), (a)(4) (1999). The Act called for the creation of national air quality standards regulating air pollution. *See generally* 42 U.S.C. § 7409 (1998). These national standards are required to be set in a manner sufficient to "protect the public health." 42 U.S.C. §§ 7409(b)(1), (b)(2) (1998). State governments are required to create an "implementation plan" specifying the manner in which these national air quality

standards will be achieved and maintained within their relevant geographical regions. 42 U.S.C. § 7407(a) (1998).

Under the Act, violation of the relevant standards may be addressed in a number of ways. Where there is noncompliance with pollution requirements, the Act provides that the Administrator shall notify both the violator and the state where the violation occurs, and, if the violation is not corrected, provides that the Administrator may issue an order requiring compliance or may bring a civil action to enforce compliance. 42 U.S.C. § 7413. In addition, the Act contains a "citizen suit" provision which permits any person to bring a civil action in district court against the violator, the administrator, or the state or federal governments, to enforce the state standards. 42 U.S.C. § 7604 (1998). In addition, any final action by the Administrator is reviewable in the United States Court of Appeals for the appropriate circuit. 42 U.S.C. § 7607 (1998).

Washington State has also adopted a Clean Air Act, Wash.Rev.Code Ch. 70.94 *et seq.*, which is intended to bring Washington into compliance with the federal Clean Air Act while insuring that the health and safety of persons vulnerable to the ill effects of pollution are protected:

> It is declared to be the public policy to preserve, protect, and enhance the air quality for current and future generations. Air is an essential resource that must be protected from harmful levels of pollution. Improving air quality is a matter of state-wide concern and is in the public interest. It is the intent of this chapter to secure and maintain levels of air quality that protect human health and safety, including the most sensitive members of the population, to comply with the requirements of the federal clean air act, to prevent injury to plant, animal life, and property, to foster the comfort and convenience of Washington's inhabitants, to promote the economic and social development of the

> state, and to facilitate the enjoyment of the natural attractions of the state.

Wash.Rev.Code § 70.94.011 (1998).

The Washington State Legislature created a comprehensive scheme in the Washington Clean Air Act to regulate agricultural burning through permits issued by the Department of Ecology. The Department of Ecology is charged with establishing general criteria of state-wide applicability for obtaining permits to burn in the course of agricultural activities. Wash. Rev.Code § 70.94.650(1)(c) (1998). Each permit issued must be conditioned to insure that the public interests in reducing air, water, and land pollution, and the interests in safety to life and property are fully considered. *Id.* An applicant for a permit must show that the setting of fires as requested is the most reasonable procedure to follow in safeguarding life or property under all circumstances or is otherwise reasonably necessary to successfully carry out the enterprise in which the applicant is engaged. *Id.* In addition, the Department has conditioned the issuance of a permit upon considerations of air quality conditions in the area affected by the proposed burning, the time of year, meteorological conditions, the size and duration of the proposed burning activity, the type and amount of vegetative material to be burned, the applicant's need to carry out such burning, the existence of extreme burning conditions, the risk of escape of the fire onto another's property, and the public's interest in the environment. Wash.Admin.Code § 173–430–070 (1999). The Plaintiffs seek the creation of a new scheme under which agricultural burning would be eliminated or restricted, and ask that temporary injunctive relief be granted restricting the Department of Ecology from permitting all wheat stubble burning until the litigation is finished or until the Department promulgates rules regulating burning that "accommodate[ ] the most sensitive members of society." Complaint at 17 (Ct.Rec.1).

■ The Court's decision not to expand the methods by which Plaintiffs can address air pollution beyond those in the Clean Air Act is guided by the Supreme Court, which has held that the enactment of a comprehensive remedial scheme in an environmental statute forecloses resort to remedies beyond those contained in the statute itself. In *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 19–21, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Court concluded that the presence of a comprehensive remedial scheme within a federal environmental statute was evidence that Congress intended to foreclose resort to 42 U.S.C. § 1983 [1] to remedy violations of the statute. The Court found it significant that the pollution control Acts allegedly violated were comprehensive in scope:

> These Acts contain unusually elaborate enforcement provisions, conferring authority to sue for this purpose both on government officials and private citizens.... In view of these elaborate enforcement provisions it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under [the Acts].

453 U.S. at 13–14, 101 S.Ct. 2615. The Court also found that the presence of a "citizen suit" provision in one of the acts supplemented the comprehensive enforcement schemes, thereby making it less likely that Congress had intended to allow other private rights of action. *Id.* at 20, 101 S.Ct. 2615. *See also Blessing v. Freestone*, 520 U.S. 329, 347, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (noting that the Court in *Sea Clammers* emphasized the availability of a private right of action in the regulatory enforcement scheme). Accordingly, the Court concluded "that the existence of these express remedies [in the statutory scheme] demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983." *Id.* at 21, 101 S.Ct. 2615.

A Pennsylvania district court addressing an analogous legal issue in a case factually similar to this one held that the comprehensive nature of the Clean Air Act's remedial scheme foreclosed claims to compel a state environmental agency to enforce state environmental laws from being brought under 42 U.S.C. §§ 1981–1986 or as common-law nuisance claims; instead, any claims must be brought under the specific environment statute applicable to the underlying conduct. *Reeger v. Mill Serv., Inc.*, 593 F.Supp. 360 (W.D.Pa.1984). The court held that the regulatory provisions under the Clean Water Act and the Marine Protection, Research and Sanctuaries Act held by the Supreme Court to foreclose civil rights remedies in *Sea Clammers* were "almost identical" to the regulatory scheme created by the Clean Air Act and the Resource Conservation and Recovery Act. 593 F.Supp. at 362. Accordingly, claims under the Civil Rights Act or federal common-law were barred by the comprehensive regulatory and remedial scheme of the Clean Air Act. *Id.* at 363.[2]

Significantly, allowing suit to be brought under the ADA or Rehabilitation Act to enforce or amend pollution regulations would circumvent the procedural requirements of the Clean Air Act Several procedural requirements must be met before a citizen suit may be taken up under the Clean Air Act. Prior to bring such an action, a citizen must give 60 days notice of the alleged violation to the Administrator,

---

1. 42 U.S.C. § 1983 creates a private cause of action for the deprivation of rights, privileges, or immunities secured under the Constitution or laws of the United States.

2. The Ninth Circuit also has held that the comprehensive nature of the Clean Air Act has also foreclosed the possibility of bringing a federal common law nuisance action based on air pollution. *National Audubon Soc. v. Department of Water*, 858 F.2d 1409 (9th Cir. 1988), *superseded by National Audubon Society v. Department of Water*, 869 F.2d 1196, 1201 (9th Cir.1988).

to the state in which the violation has occurred, and to any alleged violator. 42 U.S.C. § 7604(b)(2). For suits seeking to compel agency action, at least 180 days prior notice must be given before commencing the action. 42 U.S.C. § 7604(a). The Supreme Court was particularly concerned in *Sea Clammers* that recognizing private rights of action outside the statutory schemes created by the Clean Water Act and the Marine Protection, Research and Sanctuaries Act would result in parties effectively circumventing the procedural requirements of the statutory scheme; the Court stated that when "a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bring suit directly under § 1983." *Sea Clammers*, 453 U.S. at 20, 101 S.Ct. 2615, *quoting Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 673 n. 2, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) (Stewart, J., dissenting). *See also, American Automobile Manufacturers Association v. Cahill*, 53 F.Supp.2d 174, 185 (N.D.N.Y.1999) ("Courts intuit foreclosure based on a comprehensive remedial scheme out of the concern that parties will use the § 1983 cause of action to avoid the procedural requirements and limitations of remedies given in the statute.") Circumvention of these procedural requirements undermines the judicial economy that the requirements were designed to preserve.

Allowing Plaintiffs to bring a claim addressing the adequacy of current pollution regulations outside the statutory framework of the Clean Air Act is inconsistent with the intent of Congress to create a comprehensive remedial scheme regarding air pollution. In essence, Plaintiffs' claims would make the Clean Air Act's enforcement and provisions a nullity. The legislative history of the "citizen suit" provision of the Clean Air Act indicates that Congress enacted the provision specifically to encourage "citizen participation in the enforcement of standards and regulations established under this Act." S.Rep. No. 91-1196, p. 36 (1970). The section was intended to afford citizens "very broad opportunities to participate in the effort to prevent and abate air pollution." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), *quoting* 1 Leg.Hist., p. 138 (Senate Consideration of the Report of the Conference Committee, Dec. 18, 1970) (remarks of Sen. Eagleton). Plaintiffs' claim is foreclosed by *Sea Clammers*, since allowing a plaintiff to bring an action seeking control of air pollution under the ADA or the Rehabilitation Act "would be inconsistent with Congress'[s] carefully tailored scheme." *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), *quoting Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (§ 1983 claim foreclosed if inconsistent with statutory scheme).

The inconsistency between Plaintiffs' claim and the carefully tailored scheme regulating air pollution is highlighted by the fact that the current scheme provides a mechanism for taking the health needs of sensitive citizens into account. The purpose of the federal Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1) (1998). Pollution standards are set under the federal Act at a level "requisite to protect the public health." 42 U.S.C. § 7408(b) (1998). The Washington State Clean Air Act even more specifically protects vulnerable members of the population; its stated purpose is "to secure and maintain levels of air quality that protect human health and safety, *including the most sensitive members of the population.*" Wash.Rev.Code § 70.94.011 (1998) (emphasis added).

■ Since the statutory air pollution regulation scheme is intended to take into amount the Plaintiffs' health concerns, their claim that the Department of Ecolo-

gy has refused to enact rules or regulations to safeguard their health can be better pursued under the Washington State Administrative Procedures Act than in federal court. Wash.Rev.Code Ch. 35.04, *et seq.* The Department of Ecology is a state agency authorized to adopt such rules and regulations as are necessary and appropriate to effectuate its statutory mandate. Wash.Rev.Code §§ 43.21A.040, .080 (1998). Under Washington law, any person may at any time petition a state agency requesting the adoption, amendment, or repeal of any rule; the agency must act upon this petition within 60 days. Wash.Rev.Code § 34.05.330 (1998). If the agency fails to adopt the proposed rule, in derogation of a duty required by law to be performed, the aggrieved petitioner may seek judicial review of the agency's inaction. Wash.Rev. Code § 34.05.570(4)(b) (1998). *See also Hillis v. State,* 131 Wash.2d 373, 381, 932 P.2d 139 (Wash.1997) ("Agency inaction (such as Ecology's failure to act on the Hillis applications) is judicially reviewed by a petition filed pursuant to RCW 34.05.570(4)(b).") Accordingly, Plaintiffs could have filed a formal rule-making petition, then sought judicial review if that petition was denied. The Court is well aware that the Plaintiffs need not demonstrate an exhaustion of administrative remedies to bring claims under the ADA or the Rehabilitation Act. However, the fact that the statutory air pollution regulation scheme specifically provides for the type of protections Plaintiffs seek is a further indication that litigation under the ADA may be inappropriate in this case. Also, the availability of alternative remedies under the Clean Air Act and the Administrative Procedures Act reassure the Court that Plaintiffs have avenues outside the ADA or Rehabilitation Act by which to pursue their claims.

■ The Court's conclusion that the Plaintiffs' ADA and Rehabilitation Act claims are foreclosed by the Clean Air Act is bolstered by the well-established rule of statutory construction that where two statutes touch upon the same area, the more specific statute controls over the terms of the more general one. *Preiser v. Rodriguez,* 411 U.S. 475, 489, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (recognizing rule of statutory construction).

Furthermore, the relief requested by Plaintiffs raises serious federalism concerns since it would force this Court to order a state agency to take action in a traditional state realm. "The Supreme Court and the Ninth Circuit have stressed that district courts must be sensitive to concerns of equity, federalism, and comity when considering injunctive relief against State agencies." *Cupolo v. Bay Area Rapid Transit,* 5 F.Supp.2d 1078, 1085 (N.D.Cal.1997). *See also Thomas v. County of Los Angeles,* 978 F.2d 504, 508 (9th Cir.1992). Enjoinment of a state agency must not be undertaken lightly, as "few effective external controls check the district court's power." *Toussaint v. McCarthy,* 801 F.2d 1080, 1089 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). The Court is mindful that "[d]ue to concerns of comity and federalism, the scope of federal injunctive relief against an agency of state government must always be narrowly tailored to enforce federal constitutional and statutory law only." *Clark v. Coye,* 60 F.3d 600, 603–04 (9th Cir.1995) (citations omitted).

Actions seeking to control air pollution brought under the ADA or the Rehabilitation Act raise significant federalism concerns since the petition, if granted, would force a federal court to order a state agency to change a state policy regarding a matter that is traditionally regulated by states. As the Supreme Court has recognized, "[i]t is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Printz v. United States,* 521 U.S. 898, 928, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

Furthermore, regulating the challenged conduct under the ADA or Rehabilitation Act instead of under established statutory

schemes may very well be an unconstitutional coercion of state action to enforce a federal scheme. The Supreme Court has made it clear that federalism concerns prevent the federal government from commanding states to enforce a federal regulatory program:

> The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policy-making is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.

*Printz v. United States,* 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (holding that Brady Bill's requirement that chief law enforcement officers in each local jurisdiction perform background checks was unconstitutional). Pursuant to *Printz,* a federal court cannot order a state agency to enact regulations implementing the ADA. The relief sought in the present case would require Washington to completely redesign its statutory scheme regarding agricultural burning. Forced creation of a new regulatory scheme is entirely inconsistent with federalism, and with controlling authority.

In contrast, regulation of air pollution through the preexisting statutory framework does not raise significant federalism concerns. As discussed above, there are methods aside from the ADA or the Rehabilitation Act by which Plaintiffs may seek to enforce or amend air pollution control regulations: Plaintiffs may petition the Department of Ecology to make a rule, then seek judicial review if the petition is denied; alternatively, they may seek action under the Clean Air Act's enforcement provisions (citizen suit, etc.).[3] Con-

cerns about state sovereignty are not raised by the first course of action, since Plaintiffs' action would be conducted pursuant to Washington law and procedure. Federalism concerns stemming from the second course of action are *de minimis,* since Congress has already struck a balance between the federal and state governments under the Clean Air Act; Plaintiffs would merely proceed along this balance.

### 3. Other elements.

#### i. Irreparable injury.

The Plaintiffs in this case suffer from serious respiratory ailments which are allegedly caused or aggravated by wheat stubble burning. Tim K. is a ten-year-old boy who suffers from asthma and allergies. Alex H. is a seven-year-old girl who suffers from cystic fibrosis and severe respiratory problems.

The risk of physical injury from continued burning is sufficient to establish a risk of irreparable harm. *See, Heather K. v. City of Mallard,* 887 F.Supp. 1249, 1260 (N.D.Iowa 1995) (finding irreparable injury when "[c]ontinued open burning poses a very real health threat, possibly even a mortal threat, to Heather K."). *See also Sluiter v. Blue Cross & Blue Shield,* 979 F.Supp. 1131 (D.C.Mich.1997) (evidence that patient's chances of surviving advanced breast cancer were small in absence of requested relief established irreparable injury); *Mayer v. Wing,* 922 F.Supp. 902 (D.C.N.Y.1996) (irreparable harm shown when Medicaid recipients demonstrated that reductions in home health care services by state created nonspeculative risk of deprivation of life-sustaining medical services); *Callicotte v. Carlucci,* 698 F.Supp. 944, 950 (D.D.C. 1988) (Federal employee who suffered from chronic alcoholism and acute chronic mental depression established irreparable injury if employer were not preliminarily

---

**3.** Plaintiffs acknowledged the availability of other possible avenues of redress during oral argument.

enjoined from removing her since removal could cause employee to suffer severe physical and emotional harm).

■ In addition, the dignitary injury from a violation of the ADA may be a sufficiently irreparable injury to warrant temporary relief. *Cupolo v. Bay Area Rapid Transit,* 5 F.Supp.2d 1078, 1084 (N.D.Cal.1997) ("In addition to establishing likelihood of success on the merits, Plaintiffs must demonstrate a possibility of irreparable injury. The goals of the ADA include assuring that individuals with disabilities enjoy 'equality of opportunity, full participation, independent living, and economic self-sufficiency.' Injuries to individual dignity and deprivations of civil rights constitute irreparable injury.") *See also Sullivan v. Vallejo City Unified School Dist.,* 731 F.Supp. 947, 961 (E.D.Cal.1990) (injury to ability to function as independent person constitutes irreparable injury).

■ The customary bar against temporary relief sought by a plaintiff-movant who brings a claim for monetary damages is inapplicable to this case since the monetary damages may not be sufficient to compensate for Plaintiffs' injuries. As a general rule, irreparable harm is not present when the plaintiff has a claim for monetary damages, since the monetary award is generally sufficient compensation for the harm. *In Re Feit & Drexler, Inc.,* 760 F.2d 406, 416 (2d Cir.1985); *Hoxworth v. Blinder Robinson & Co.,* 903 F.2d 186, 205 (3d Cir.1990); *Alvenus Shipping v. Delta Petroleum (U.S.A.) Ltd.,* 876 F.Supp. 482, 487 (S.D.N.Y.1994). However, a claim for monetary damages will not preclude temporary relief if the monetary damages will be inadequate to compensate the movant for his or her damages. *See Chalk v. United States District Court Central District of California,* 840 F.2d 701, 708 (9th Cir.1988) (emotional and psychological injury caused by deprivation of personal satisfaction in job was proper consideration in determining whether irreparable harm existed since such loss cannot be adequately compensated by a monetary award). *See*

*also Lee v. McManus,* 543 F.Supp. 386, 392 (D.C.Kan.1982) (pain, anxiety, and discomfort suffered by paraplegic inmate from failure to provide adequate medical care "constitutes the type of irreparable harm upon the threat of which preliminary injunctive relief may be predicated" even though inmate "may eventually receive compensatory damages as a result of physical injury" since such an award would be insufficient to repair the injury and accompanying pain). The Plaintiffs' treating physician, Michael McCarthy, indicates that continued burning exacerbates Plaintiffs' health problems, makes them more vulnerable to future infection, and generally impairs their ability to lead regular lives. *See* Affidavit of Michael McCarthy in re: Tim K., Affidavit of Michael McCarthy in re: Alex H. (Ct.Rec.3).

ii. Likelihood of success on the merits.

If Plaintiffs were to establish that they had legal basis upon which to bring an ADA or Rehabilitation Act claim, the Court would find that they have established a likelihood of success on the merits.

The elements of a Title II ADA claim, modeled on § 504 of the Rehabilitation Act, are: (1) that the plaintiff is a "qualified individual with a disability"; (2) that he or she was either excluded from participation or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Does 1–5 v. Chandler,* 83 F.3d 1150, 1154 (9th Cir.1996).

The first element is satisfied since Plaintiffs are clearly qualified individuals with disabilities. A "qualified individual with a disability" is a person who, with or without reasonable modifications to rules, policies, or practices meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2). Under the ADA, a

"disability" is: (1) a physical or mental impairment that substantially limits one or more major life activities of the individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2).[4] The phrase "physical or mental impairment" includes any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine. 28 C.F.R. § 35.104 (1999). "Major life activities" include breathing. *Id.*

Both Plaintiffs meet the definition of "disability" since both suffer from severe respiratory problems. Tim K. suffers from severe asthma and allergies; Alex H. suffers from cystic fibrosis. In *Heather K.,* the court held that there was "little doubt" that a plaintiff afflicted by severe respiratory and cardiac conditions aggravated by smoke was a qualified individual with a disability. 887 F.Supp., at 1261–62.

Plaintiffs are likely to establish the second element of a prima facie ADA or Rehabilitation Act claim since they are effectively excluded from all public areas during burning. These public areas constitute "programs" or "services" of the state. The Ninth Circuit has held that virtually all public places can constitute "services" or "programs" of the state. *See Crowder v. Kitagawa,* 81 F.3d 1480, 1485 (9th Cir.1996) (holding that visually-impaired persons were denied access to state services, programs, and activities when state policy required quarantine of their guide animals since the policy prevented them from using "a variety of public services, such as transportation, public parks, buildings and facilities, and tourist attractions, where humans or animals are inevitably present.") *See also, Innovative Health Sys., Inc. v. City of White Plains,*

117 F.3d 37, 45 (2d Cir.1997) (language of ADA Title II did not limit plaintiff's claims to actual "programs, services, or activities" of city since that statutory language was a catch-all phrase prohibiting all discrimination by a public entity regardless of context).

The Court also finds that Plaintiffs are likely to establish the third element of a prima facie claim since, although the challenged regulations and actions are facially neutral, the Plaintiffs may well be able to establish that the refusal to restrict burning denied them of meaningful access to public services or programs.

The third element of a prima facie case is satisfied if a plaintiff establishes that he or she was denied "meaningful access" to a public service or program. Discriminatory animus is not necessary; however, a mere showing of discriminatory impact is not sufficient. *See Alexander v. Choate,* 469 U.S. 287, 299, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (holding that discriminatory animus is not necessary to establish § 504 claim, but "reject[ing] the boundless notion that all disparate impact showings constitute prima facie cases under § 504"). Instead, the proper test is whether Plaintiffs were denied "meaningful access" to public programs. In *Crowder v. Kitagawa,* 81 F.3d 1480, 1484 (9th Cir.1996), the Ninth Circuit held that a district court erred by concluding that a public health measure of the state of Hawaii which was designed to prevent the spread of rabies by quarantining all animals upon their import into the islands could not violate Title II of the ADA since it was not a service or benefit furnished by the state. The court explained:

The flaw in the [district court's] analysis is the assumption that no violation of the ADA occurs unless a service or benefit of the state is provided in a manner that discriminates against disabled individuals. This simply is not so ... Section 12132 of the ADA precludes (1) exclusion from/denial of benefits of public ser-

4. The same definition is used under the Rehabilitation Act. *See* 29 U.S.C. § 706(8)(B).

vices, as well as (2) discrimination by a public entity. Due to the insertion of "or" between exclusion from/denial of benefits on the one hand and discrimination by a public entity on the other, we conclude that Congress intended to prohibit two different phenomena. Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability.

*Crowder,* 81 F.3d at 1484. The *Crowder* court, however, declined to categorize alleged acts of discrimination as either "deliberate" or "disparate impact," choosing instead to assess whether disabled persons were denied "meaningful access" to state-provided services. *Id.* at 1484–85. *See also Alexander v. Choate,* 469 U.S. 287, 295, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (noting that Congress intended to protect disabled persons under Rehabilitation Act from discrimination arising out of both discriminatory animus and "thoughtlessness," "indifference," or "benign neglect," and applying "meaningful access" test to claims brought under § 504 of Rehabilitation Act).

The Plaintiffs in this case are likely to show that they have been denied meaningful access to public services or programs. The Complaint explains that during times when wheat stubble is burning, Plaintiff Tim K. is unable to go outdoors, to attend school, or even to travel in a car to his doctor. Complaint at ¶ 4.12 (Ct.Rec.1). Alex K. is forced to leave her home when wheat stubble is being burned and is prevented from attending school by the smoke. Complaint at 4.24 (Ct.Rec.1).

### iii. Balance of hardships and the public interest.

The Court finds that the Plaintiffs have demonstrated that the balance of hardships tips in their favor, and that the public interest in preserving safety and health

favors issuance of a temporary restraining order.

 Even if the moving party makes a strong showing of likelihood of prevailing on the merits, "at least a minimal tip in the balance of hardships must be found" before the relief will issue. *Chalk v. United States District Court Central District of California,* 840 F.2d 701, 710 (9th Cir. 1988), *citing, L.A. Coliseum,* 634 F.2d at 1203–04. A party seeking to tip the balance of hardships must go beyond mere allegations and actually demonstrate that a particular harm is imminent. *Pile Drivers, Divers, Carpenters, Bridge, Wharf & Dock Builders Local Union 34 v. Northern California Regional Council,* 992 F.Supp. 1138, 1148 (D.C.Cal.1997).

 Plaintiffs have made a sufficient showing that the balance of hardships favors temporary relief by demonstrating that the hardship caused to Plaintiffs by continued burning is substantial, and by demonstrating that wheat farmers can use alternative methods to clear wheat stubble from fields, thereby minimizing any harm from a temporary restraint.[5] Plaintiffs cite numerous non-incendiary methods for achieving the goals of stubble burning (control of weeds, diseases, and pests). According to Plaintiffs, the alternatives to stubble burning for pest control are legion: the use of resistant/tolerant varieties of wheat, seeding date adjustment, adjustment of the seed rate and row spacing, site-specific crop rotation systems targeted to manage the specific pest organism, use of crop-protection chemicals to minimize pest impacts, mechanical cultivation practices that provide past control, site-specific identification of pests contributing to losses, inclusion of management systems that will reduce or eliminate plant hosts that harbor inspects pests, and review of the pest infestation with attention to all tools available with Integrated Pest Management. Plaintiffs' Memorandum of Points and Authorities at 15–16 (Ct.Rec.3). The

---

**5.** The harm to Plaintiffs is discussed under the irreparable injury analysis, *supra.*

alternatives for residue removal of stubble include incorporating the residue into the soil, seeding directly into standing stubble using a "no-till" drill, or baling and removing wheat straw. *Id.* at 16.

 Furthermore, the public interest in preserving health and safety favors issuance of a temporary restraining order. There is significant evidence in the record that agricultural burning may pose a significant threat to public health. Janet Monaco, Executive Director of the Spokane Medical Society, explained that there is a documented correlation between particulate matter caused by grass burning and the incidence of respiratory disease. Affidavit of Janet Monaco at ¶ 7 (Ct.Rec.3). Monaco's findings are echoed by Dr. Jane Koenig, professor of physiology and toxicology at the University of Washington and Director of the EPA Northwest Research Center for Particulate Matter Air Pollution and Health. Dr. Koenig explains that the particulate matter from wheat stubble burning "penetrates deeply into the lungs where it may cause negative health effects for everyone, especially individuals with chronic pulmonary diseases (including asthma, cystic fibrosis, and emphysema)". Affidavit of Jane Koenig at ¶¶ 3–4, 8 (Ct.Rec.3).

## CONCLUSION

The Court would issue a TRO if it believed it had jurisdiction to hear Plaintiffs' ADA and Rehabilitation Act claims. The Court believes it lacks jurisdiction since Congress enacted a comprehensive regulatory and remedial scheme to control air pollution. Allowing control of air pollution outside this scheme under the ADA or the Rehabilitation Act necessitates finding that Congress intended these Acts to amend the comprehensive scheme established by the Clean Air Act. The Court does not believe that Congress intended such an amendment. Furthermore, the Court finds that the type of conduct challenged in this case, a state agency's refusal to promulgate or enforce more stringent burning regulations, was not the type of conduct the ADA or the Rehabilitation Act were intended to address. Accordingly, **IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction **(Ct.Rec.2)** is **DENIED.**

2. Plaintiffs' Motion for an Overlength Memo in Support of Motion for Temporary Restraining Order and Preliminary Injunction **(Ct.Rec.4)** is **GRANTED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel.

## ORDER DENYING MOTION TO DISMISS AND DENYING MOTION TO RECONSIDER

Before the Court are Defendants' Motion to Dismiss (Ct.Rec.12) and Plaintiffs' Motion for Reconsideration (Ct.Rec.17). Oral argument was heard on these motions on September 13, 2000. Plaintiffs were represented by Karen Lindholdt and James Sheehan. Defendants were represented by Leslie Seffern and Grant Pfeifer. For the reasons discussed below, both motions are denied.

## BACKGROUND

On October 8, 1999, the Court denied Plaintiffs' motion for a temporary restraining order. The Court held that although Plaintiffs had established all elements necessary for temporary relief to issue, the Court lacked jurisdiction to order relief since Plaintiffs' Americans with Disabilities Act (ADA) and Rehabilitation Act claims were foreclosed by the comprehensive regulatory scheme contained in the Clean Air Act (CAA). Plaintiffs ask this Court to reconsider that decision; Defendants ask the Court to dismiss Plaintiffs' claims on that basis.

## ANALYSIS

*1. Defendants' motion to dismiss.*

The Court's denial of Plaintiffs' motion for temporary injunctive relief was largely

based upon the Supreme Court's decision in *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). In that case, the Court held that a plaintiff could not bring an action under 42 U.S.C. § 1983 to enforce rights created by the Clean Water Act. *Id.* at 19–21, 101 S.Ct. 2615. In so holding, the Court focused on the comprehensive nature of the remedial scheme contained within the Clean Water Act, and concluded that the comprehensiveness of that scheme was evidence that Congress intended to foreclose resort to § 1983 to remedy violations of the Clean Water Act. *Id.* at 13–14, 101 S.Ct. 2615 ("These Acts contain unusually elaborate enforcement provisions, conferring authority to sue for this purpose both on government officials and private citizens.... In view of these elaborate enforcement provisions it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under [the Acts].") The Court also found that the presence of a "citizen suit" provision in one of the Acts at issue supplemented the comprehensive enforcement schemes, thereby making it less likely that Congress had intended to allow other private rights of action. *Id.* at 20, 101 S.Ct. 2615. Accordingly, the Court concluded "that the existence of these express remedies [in the statutory scheme] demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983." *Id.* at 21, 101 S.Ct. 2615.

The Court previously read *Sea Clammers* broadly for the proposition that the comprehensiveness of a statutory scheme forecloses resort to any remedy outside that scheme. Defendants' motion to dismiss is based upon the same broad reading. Upon further consideration, the Court concludes that such a broad reading is in error.

■ As Plaintiffs and amicus curiae United States point out, *Sea Clammers* can be read much more narrowly as holding only that § 1983 cannot be used to enforce rights created by a statutory scheme that already include comprehensive remedial measures. The Court finds that this reading is more appropriate than the broad reading previously adopted by the Court. Under this reading of *Sea Clammers*, the broad sweep of the CAA does not preclude Plaintiffs from bringing suit under the ADA; instead, *Sea Clammers* merely prevent Plaintiffs from bringing suit under § 1983 to enforce rights created by the CAA or the ADA (both comprehensive schemes). Such a reading recognizes the fundamental difference between 42 U.S.C. § 1983, which is a Congressional "vessel" intended to enforce the protections of the Fourteenth Amendment[1] generally, and the Americans with Disabilities Act, which provides rights and remedies distinct from other federal statutes.[2] The motion to dismiss will be denied.

*2. Plaintiffs' motion for reconsideration.*

The Court declines to reconsider its denial of Plaintiffs' motion for a temporary

---

**1.** *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934 n. 17, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ("[T]hroughout the congressional debate over the 1871 Act, the bill was officially described as a bill 'to enforce the provisions of the fourteenth amendment to the Constitution of the United States.'"); *Lynch v. Household Finance Corp.*, 405 U.S. 538, 545, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972) (Civil Rights Act of 1871 was passed "for the express purpose of 'enforc[ing] the Provisions of the Fourteenth Amendment.'"); *Quern v. Jordan*, 440 U.S. 332, 354, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (Brennan, J., concurring)

("Section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871. The Act was enacted for the purpose of enforcing the provisions of the Fourteenth Amendment.").

**2.** This narrow interpretation is particularly sensible in light of several cases holding that a plaintiff may not bring a § 1983 suit to enforce rights created by the ADA. *See Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir.1999); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir.1997).

restraining order since it concludes that Plaintiffs have failed to establish a likelihood of success on the merits. *See International Jensen, Inc. v. Metrosound U.S.A., Inc.* 4 F.3d 819, 822 (9th Cir.1993) (party seeking temporary restraining order or preliminary injunctive relief must establish likelihood of success on the merits.)

■ The universe of potential remedies available to Plaintiffs under the ADA or the Rehabilitation Act will likely be small because of the broad sweep of the CAA. Although the comprehensiveness of the CAA may not entirely preclude Plaintiffs' suit, it does preclude Plaintiffs from obtaining relief under the ADA or the Rehabilitation Act that would infringe upon subject matter governed by the CAA. The ADA and the Rehabilitation Act only require a State to make reasonable modifications; the statutes do not require a State to make fundamental changes to existing programs. *See Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (recognizing fundamental alteration defense by State to claim brought under Title II of the ADA,); *Alexander v. Choate*, 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (recognizing fundamental alteration defense to Rehabilitation Act claims).

Even if the relief Plaintiffs seek would not work a fundamental change to the existing air pollution control scheme, the relief is still unavailable if it would eliminate entitlements otherwise provided for by the Clean Air Act or infringe upon areas ordinarily regulated under that Act. The CAA established comprehensive procedures that must be followed prior to imposing government regulation of private activities or to bringing an action under the citizen suit provision.[3] To the extent that Plaintiffs seek to use the ADA to modify any regulations imposed through the CAA's statutory scheme, or to obtain a result otherwise obtainable only under the CAA's citizen suit provision, a conflict arises between the procedural requirements of the two statutory schemes. As a rule, "[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Traynor v. Turnage*, 485 U.S. 535, 548, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988). Plaintiffs urge the Court to reconcile the conflict by entirely disregarding the CAA so far as it is in conflict with the ADA.

In order to entirely disregard the CAA in favor of the ADA as Plaintiffs urge, the

3. The Clean Air Act requires the creation of national air quality standards regulating air pollution. *See generally* 42 U.S.C. § 7409 (1998). These national standards are required to be set in a manner sufficient to "protect the public health." 42 U.S.C. §§ 7409(b)(1), (b)(2) (1998). State governments are required to create an "implementation plan" specifying the manner in which these national air quality standards will be achieved and maintained within their relevant geographical regions. 42 U.S.C. § 7407(a) (1998). Under the Act, violation of the relevant standards may be addressed in a number of ways. Where there is noncompliance with pollution requirements, the Act provides that the Administrator shall notify both the violator and the state where the violation occurs, and, if the violation is not corrected, provides that the Administrator may issue an order requiring compliance or may bring a civil action to enforce compliance. 42 U.S.C. § 7413. In addition, the Act contains a "citizen suit" provision which permits any person to bring a civil action in district court against the violator, the administrator, or the state or federal governments, to enforce the state standards. 42 U.S.C. § 7604 (1998). However, several procedural requirements must be met before a citizen suit may be taken up under the Clean Air Act. Prior to bring such an action, a citizen must give 60 days notice of the alleged violation to the Administrator, to the state in which the violation has occurred, and to any alleged violator. 42 U.S.C. § 7604(b)(2). For suits seeking to compel agency action, at least 180 days prior notice must be given before commencing the action. 42 U.S.C. § 7604(a). Any final action by the Administrator is reviewable in the United States Court of Appeals for the appropriate circuit. 42 U.S.C. § 7607 (1998).

Court would have to conclude that the ADA implicitly repealed the CAA with regard to air pollution affecting disabled persons. Repeals by implication are "heavily disfavored," and may be found in only two circumstances: (1) where one statute entirely displaces another; or (2) where two statutes are in irreconcilable conflict. *NLRB v. Kolkka,* 170 F.3d 937, 941 (9th Cir.1999), *citing Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976). "[I]n either case, the intention of the legislature to repeal must be clear and manifest." *Radzanower,* 426 U.S. at 154, 96 S.Ct. 1989, *quoting Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936). The first exception applies only if the latter statute covered the entire subject of the previous statute, or if the latter statute was "clearly intended as a substitute" for the former. *Id.* There is no express indication in the ADA that it repealed the CAA, and the ADA was obviously not intended to supplant the CAA as the statute regulating air pollution. Accordingly, there is no repeal unless the two statutes are in irreconcilable conflict.

There is no irreconcilable conflict between the CAA and the ADA since the regulation by the CAA of air pollution affecting disabled individuals can be read as an exception to the ADA. "Irreconcil-able conflict will not be found merely because two statutes compel different results in a particular case"; instead, "there must be a 'repugnancy' between the words or purposes of the two statutes." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976). "Repeal is to be regarded as implied only if necessary to make the [later-enacted law] work, and even then, only to the minimum extent necessary." *NLRB v. Kolkka,* 170 F.3d 937, 941 (9th Cir.1999). There is no evidence that reading the CAA as an exception to the ADA will frustrate the entire ADA statutory scheme; at most, it will serve as a small exception affecting only the limited portion of the disabled population that suffers from severe breathing problems. *See Lujan–Armendariz v. Immigration and Naturalization Service,* 222 F.3d 728 (9th Cir.2000) (finding statutory conflict reconcilable after concluding that earlier-enacted statute could be read as a "minor exception" governing only a small number of persons "that would not frustrate the broad purposes" of a later-enacted statute.) The Court concludes that there is no evidence of a "clear and manifest" intention of Congress to preempt the CAA by the ADA[4], particularly in light of the dramatic effect this ruling would have in upsetting the delicate state-federal[5] and

4. Such an intention further unlikely in light of the Supreme Court's finding of Congressional intent in the context of the Rehabilitation Act:

> Because the handicapped typically are not similarly situated to the nonhandicapped, respondent's position would in essence require each recipient of federal funds to evaluate the effect on the handicapped of every proposed action that might touch the interests of the handicapped, and then to consider alternatives for achieving the same objectives with less severe disadvantage to the handicapped. The formalization and policing of this process could lead to a wholly unwieldy administrative and adjudicative burden. Had Congress intended § 504 to be a National Environmental Policy Act for the handicapped, requiring the preparation of "Handicapped Impact Statements" before any action was taken by a grantee that affected the handicapped, we would expect some indication of that purpose in the stat-

> ute or its legislative history. Yet there is nothing to suggest that such was Congress' purpose.

*Alexander v. Choate,* 469 U.S. 287, 298–99, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (citation omitted).

5. Congress has struck a delicate balance between states and the federal government by allocating power and responsibilities among the numerous government bodies involved in regulation of air pollution. This scheme rests on cooperation between the federal government and states, and recognizes that although "Federal financial assistance and leadership is essential" to successful control of pollution, "air pollution prevention ... and air pollution control at its source is the primary responsibility of State and local governments." 42 U.S.C. §§ 7401(a)(3), (a)(4) (1999). The inconsistency between Plaintiffs' claims and the carefully tailored scheme regulating air pollu-

government-industry balances struck in the CAA.

In the absence of Congressional intent to repeal the CAA, the statutory conflict should be reconciled by interpreting the later-enacted ADA consistently with the requirements of the earlier-enacted CAA, not vice versa as argued by Plaintiffs. *See Lujan–Armendariz, supra* at 744. This rule holds true even if the result compelled by such an interpretation would be contrary to that compelled by the later-enacted statute in the absence of the earlier-enacted law. *See, e.g., id.* at 743–48; *NLRB v. Kolkka,* 170 F.3d 937 (9th Cir. 1999); *Donaldson v. United States,* 653 F.2d 414, 418 (9th Cir.1981).

The specific injunctive relief sought by Plaintiffs which would preclude burning or permit issuance appears to be precluded by the CAA; the Court cannot determine at this time whether other remedies will also be precluded. Accordingly, it is unlikely that Plaintiffs will prevail on the merits for the requested injunctive relief because of conflict with the CAA. The motion will be denied.

## CONCLUSION

**IT IS HEREBY ORDERED:**

1. Defendants' motion to dismiss for failure to state a claim **(Ct.Rec.12)** is **DENIED.**

2. Plaintiffs' motion for reconsideration **(Ct.Rec.17)** is **DENIED.**

3. Plaintiffs' motion for an overlength memo **(Ct.Rec.19)** is **GRANTED.**

4. Defendants' motion for an overlength memorandum **(Ct.Rec.27)** is **GRANTED.**

5. Defendants' motion to extend time to file a reply brief **(Ct.Rec.34)** is **GRANTED.**

6. Defendants' motion to amend motion for extension of time to file reply brief **(Ct.Rec.38)** is **GRANTED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel.